BURDETTE E. MOELLER AND MICHAEL LEWIS MOELLER, A MINOR, BY BURDETTE E. MOELLER, HIS FATHER AND NATURAL GUARDIAN, v. VICTOR P. HAUSER AND WILLIAM O. FINKELNBERG.
MICHAEL LEWIS MOELLER, A MINOR, BY BURDETTE E. MOELLER, HIS FATHER AND NATURAL GUARDIAN, v. CLARENCE G. LOFQUIST AND OTHERS.[1]

August 1, 1952.

Nos. 35,676, 35,677, 35,678, 35,679, 35,680.

<hr>

[1]Reported in 54 N. W. (2d) 639.

*R. E. Cummins, Linus J. Hammond,* and *Cummins, Cummins, Hammond & Ames,* for appellant Victor P. Hauser.

*Briggs, Gilbert, Morton, Kyle & Macartney, William P. O'Brien,* and *Frank N. Graham,* for appellants William O. Finkelnberg and County Welfare Board of Ramsey County.

*Silver, Green & Goff* and *Desmond B. Hunt,* for respondents.

FRANK T. GALLAGHER, JUSTICE.

Plaintiff Michael Lewis Moeller, when five years of age, suffered serious injury to his right foot while he was being treated in Ancker Hospital for a leg fracture. Michael, through his father, Burdette E. Moeller, as guardian, brought suits against a group of doctors and against the Ramsey County Welfare Board. The father brought suit against the doctors seeking recovery of the medical expenses incurred by reason of Michael's injury. The suits were tried together. During the course of the trial the actions were dismissed as to all the defendants except Dr. Victor P. Hauser, Dr. William O. Finkelnberg, and the Ramsey County Welfare Board. The jury returned a verdict for Michael of $30,000 against Drs. Hauser and Finkelnberg; one of $1,311.05 for the father against said doctors; and one of $10,000 for Michael against the County

Welfare Board. All three defendants appeal from orders denying their alternative motions for judgment notwithstanding the verdicts or a new trial.

On June 6, 1947, while visiting in St. Paul, Michael Lewis Moeller, a resident of Rochester, Minnesota, accidentally sustained a simple fracture of the middle third of the right femur (the bone between the hip and the knee). He was taken to Ancker Hospital in St. Paul in a police ambulance. Ancker Hospital is operated by the Ramsey County Welfare Board primarily for indigent persons in need of medical care who cannot pay for it. The hospital does not refuse any emergency accident cases, however, and those who are able to pay the hospital costs are required to do so. Michael was classified as a pay patient.

In order to understand the issues presented by this case, it is necessary to summarize generally the organization and functions of the hospital. The hospital employs and pays resident doctors, internes, and nurses. The work of the hospital is divided into a number of divisions of service, and the internes rotate among these divisions, serving approximately one month in each one. Internes provide medical services under the supervision of resident doctors.

The resident doctors, as a rule, are fully licensed physicians. They are assigned to supervise the internes in providing the details of medical service, physical examinations, and necessary treatment with which the internes are charged; to assist them when their experience or practice is not sufficiently advanced so that they can do it themselves; and to report to the attending staff the progress and the effects of treatment. In addition, the resident is at the hospital to perfect himself in the specialty of his choice, and part of his activities have to do with studies directed toward that end. The resident doctors rotate in the divisions of service about every six months.

The staff doctors have established practices and maintain offices in St. Paul. They are appointed by the County Welfare Board after approval by the executive committee of the hospital. The staff doctors, for purposes of administrative and professional effi-

ciency, are divided into various divisions, such as surgery, orthopedics, and internal medicine. They rotate between the various services and change regularly.

The medical staff has its constitution, bylaws, and rules and regulations (plaintiffs' exhibit A), which have been approved by the County Welfare Board. These rules and regulations prescribe the duties and responsibilities, within the organization of the hospital, of members of the medical staff and include the following provisions:

Paragraph 3 provides that patients shall be assigned to divisions and services by the superintendent; paragraph 4 provides that final responsibility for the care of patients shall rest with the senior attending physician to whom the cases are assigned; paragraph 5 pertains to physicians' written orders and provides that unwritten orders shall be disregarded, but that an order shall be considered in writing if dictated to a senior nurse or other authorized person and signed by the attending physician or his authorized representative; paragraph 13 provides that no physician shall receive any compensation for attendance in the case of any patient who is admitted free; paragraph 15 provides in part that in the case of an application for admission of a paying patient who has no attending physician he shall be assigned to a member of the attending staff; and paragraph 21 provides that the training of internes and residents shall be recognized as an obligation of the staff, and suitable provision shall be made for the furtherance of such training in all details in all the specialties involved.

During the period from May 31 to June 30, 1947, Dr. Hauser was the senior attending physician assigned to the fracture service at the hospital. As such senior attending physician, he assigned incoming patients to the particular doctors on the service, and he assigned the care of Michael Moeller to himself as attending physician. The practice was for each attending physician to retain in his care patients assigned to him until the patient was discharged, even though the term of service of the doctor on the particular service expired at some earlier time.

When Michael was taken to the hospital on June 6, 1947, he was given emergency treatment in the hospital receiving room, and it was determined that he had a simple fracture of the femur of the right limb. Dr. Myrle E. Windmiller, the resident doctor, contacted Dr. Hauser, the staff doctor, regarding Michael's injury, and Dr. Hauser advised Dr. Windmiller to use the Bryant's method of overhead traction. Dr. Hauser testified that he saw Michael on the following day and that he saw him probably six or seven times between June 7 and June 30. He said that he last examined the patient on June 30 and found his condition satisfactory. On July 1, the residents and internes were rotated in the customary manner, and Dr. Finkelnberg replaced Dr. Windmiller as the resident doctor assigned to the fracture service.

Dr. Finkelnberg testified that on coming into the service on July 1 he examined Michael and determined that the traction had slipped. He therefore took the boy out of traction and reapplied traction. He said that he saw the boy at least once and usually twice a day between July 1 and July 10 and that at those times he always inspected the foot to see if the color was all right, if the toes were warm, if the boy could wiggle his toes, if there was any swelling, and if the bandage was loose. Dr. Finkelnberg testified that Dr. Hauser was the staff physician on the Moeller case. He said that he did not see Dr. Hauser between July 1 and July 10, but that there had been no reason to call him. The record does show, however, that on July 7 the boy developed a punctate rash on the chest and abdomen similar to a rash which he previously had some time after entering the hospital in June. At eight o'clock that morning his temperature was 100.2, where it remained until about eight o'clock that evening, when it was 101.6. On the morning of July 8 his temperature (rectal) was 101. At 6 p. m. that day it was 103.8. He was given penicillin, and on the morning of July 9 his temperature had dropped to 100.2. On the 10th, his temperature varied from 99.6 to 100.6.

On July 10, Michael complained of pain, and Dr. Finkelnberg took him out of traction. He found that a severe pressure sore,

caused by localized and continued pressure which cut off circulation, had developed on the top of his foot. There was an area of ulceration and necrosis, where the skin had come away, which measured about two or two and a half inches in diameter and included the tissue just beneath the skin. The tendons were exposed, and at least one tendon was injured. Michael remained at Ancker Hospital until the wound was cleaned up, which was August 2, 1947, at which time he was removed to St. Mary's Hospital in Rochester. When he arrived there, a skin graft was performed to cover the raw area, and Michael remained at St. Mary's until August 28, 1947. On June 14, 1948, he was again hospitalized, and an operation was performed on the tendons of the foot by using an unharmed portion of the extensor tendon of the great toe as a cable graft and sewing the same into the anterior tibialis tendon in an effort to restore its continuity. On August 10, 1948, a skin graft was again performed on an ulcer which had developed in the old skin graft. Dr. William H. Bickel of the Mayo Clinic at Rochester, testifying for plaintiffs, estimated that the injury to the foot had left Michael with a permanent partial disability of somewhere between 30 and 40 percent.

Because each defendant presents somewhat different contentions, it is necessary to consider each case separately in connection with the question of negligence involved.

■ We shall first consider the issues raised by Dr. Finkelnberg. He contends that the evidence does not support the finding that he was negligent. He points to the testimony of expert witnesses to the effect that the treatment which he gave the patient from July 1 to July 10, 1947, was in accordance with the usual practice of the average careful physician in this community. He also relies on the testimony of these expert witnesses that pressure sores are common in cases where the patient is in traction and that pressure sores will develop in spite of the exercise of due care.

Under our rules, it is necessary that we examine the evidence in the light most favorable to the prevailing party. It is our opinion

that the finding of negligence against Dr. Finkelnberg is amply supported by the evidence in the record.

Whether Dr. Finkelnberg was actually as attentive as his testimony indicated was a question for the jury. There was direct testimony by plaintiffs' witness Dr. Bickel that a pressure sore of the serious nature suffered by Michael would not have occurred if he had received care in accordance with the practice of an ordinary physician and surgeon in good standing in the community. While the testimony of the various doctors was to a certain degree conflicting, the jury could have found that this sore resulted from pressure which continued at least two days, or as early as July 8, and that earlier discovery would have prevented much of the damage. There was also testimony that earlier discovery would have been made if there had been proper examinations. The testimony indicated that the principal danger to be guarded against while a patient is in traction is the development of pressure sores, and that the main purpose of daily examination is to check against pressure points. This case was ably presented by both sides, and there is evidentiary material to support Dr. Finkelnberg's claim that he exercised due care. However, we cannot, in view of the record here made out, agree that the jury's verdict was without ample evidence to support it.

Dr. Finkelnberg contends that the failure of the court to give certain requested instructions constitutes reversible error. Requested instruction No. 3 was to the effect that the fact that a certain practice was or was not followed by plaintiffs' expert Dr. Bickel or his associates in the Mayo Clinic was not conclusive; that Dr. Finkelnberg's treatment of the case was not necessarily to be judged by the standards of Dr. Bickel and his associates in the Mayo Clinic; and that Dr. Finkelnberg was required to possess only the skill and learning possessed by the average member of his school of the profession in good standing in his locality and to exercise that skill and learning with due care.

It is well-settled law that a physician or surgeon is not an insurer of a cure or a good result of his treatment or operation. He

is only required to possess the skill and learning possessed by the average member of his school of the profession in good standing in his locality and to apply that skill and learning with due care. 5 Dunnell, Dig. & Supp. § 7488, and cases cited.

In our opinion, the refusal to charge the jury that the practice of Dr. Bickel or his associates was not conclusive did not constitute reversible error. The jury was instructed as to the proper standard to be applied. It heard various witnesses testify as to what care was required by this standard, and it was free to draw its own conclusions. The court did instruct the jury that the testimony of the experts was subject to the same tests as to weight and credibility as any other testimony.

We have also examined the other requested instructions which the court refused to give explicitly, and we find no reversible error. We agree with the trial court that the instructions as given made it clear that the liability of each doctor depended on a finding that he himself had been negligent, and that neither doctor was responsible for the negligence of the other or of any other person, such as nurses or internes, who might have been found to be negligent. A careful examination of the court's instructions satisfies us that the charge as a whole conveyed to the jury a clear and correct understanding of the law of the case as it pertained to all the parties involved. That is all that is required by way of instructions. Barnes v. Northwest Airlines, Inc. 233 Minn. 410, 47 N. W. (2d) 180.

■ The trial court ruled that the Ramsey County Welfare Board, as operator of the hospital was liable for the negligence of Dr. Finkelnberg under the doctrine of *respondeat superior*. It is the position of the welfare board that the hospital is not liable for the negligence of a resident physician or surgeon with respect to matters relating to the patient's medical care. The board argues that Dr. Finkelnberg was under the authoritative control of the staff doctor, Dr. Hauser; therefore, that the hospital cannot be liable under the doctrine of *respondeat superior*. The board cites St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W.

(2d) 637, and Nepstad v. Lambert, 235 Minn. 1, 50 N. W. (2d) 614, in support of this argument. The St. Joseph's Hospital case presented a different fact situation. The court held there that the hospital was not liable under the doctrine of *respondeat superior* for the negligent acts of nurses done while they were assisting a surgeon in performing an operation; that under the circumstances the surgeon had exclusive control over the activities of the nurses; and that therefore, under those conditions, the hospital could not be said to have been a "joint master" or "comaster," even though the nurses were in the general employ of the hospital and paid by it, citing cases.

While it appears from the record that the staff doctors have the final responsibility for the care of patients and that they supervise the activities of the resident doctor to some extent, there is nothing to indicate that this supervision extends to the duties which the residents perform as a part of the general hospital routine. It is apparent from the record that the jury determined that Dr. Finkelnberg's negligence was in his failure to properly perform these routine duties. For that reason, the principle of the St. Joseph's Hospital case is not applicable.

Nor do we consider Nepstad v. Lambert, *supra,* of any aid to the welfare board in the case at bar. In that case, there were two employers involved; a truck crane service company and a general contractor engaged in enlarging a manufacturing plant. The general contractor engaged the service of the crane company, which sent two men with the truck crane for the purpose of operating the crane. In the course of operations, a portion of the crane came in contact with an electric wire of a power company, injuring an employe of the general contractor. The employe brought suit against the crane company and the operator it sent with the truck, as well as the power company. The court said there that the crucial question was which employer had the right to control the particular act giving rise to the injury—the crane company or the general contractor. The jury found against the crane company and its operator and the power company. Upon appeal to this court, the deci-

sion was reversed as to the crane company on the ground that the operator of the crane, at the time of the accident, was under the exclusive control of the general contractor with respect to the act which caused the injury. Inasmuch as it is apparent here that the jury found that Dr. Finkelnberg's negligence was in his failure to properly perform the routine duties in connection with the care of plaintiff, it appears to us that the rule in the Nepstad case is not applicable.

The welfare board also cites cases supporting the proposition that a hospital is not liable for the negligence of physicians while they are acting in a professional capacity. It is said that the relation between a hospital and its physicians is not that of master and servant. Schloendorff v. Society of New York Hospital, 211 N. Y. 125, 105 N. E. 92, 52 L.R.A.(N.S.) 505, Ann. Cas. 1915C, 581 (affirming 149 App. Div. 915, 133 N. Y. S. 1143); Rosane v. Senger, 112 Colo. 363, 149 P. (2d) 372; Iterman v. Baker, 214 Ind. 308, 15 N. E. (2d) 365. The same approach was applied to the services of nurses in Bakal v. University Heights Sanitarium, Inc. 277 App. Div. 572, 101 N. Y. S. (2d) 385 (affirmed, 302 N. Y. 870, 100 N. E. [2d] 51).

It is well established in this state that a hospital, private or charitable, is liable to a patient for the torts of its employes under the doctrine of *respondeat superior*. St. Paul-Mercury Ind. Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N. W. (2d) 637, and cases cited. There appears to be no case in this jurisdiction where the relationship between a hospital and a physician in its employ is discussed. However, that the relationship between the hospital and a nurse in the performance of her routine nursing functions is that of master and servant seems implicit in the opinion in the St. Joseph's Hospital case. See, Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N. W. (2d) 426. In certain other jurisdictions it appears well settled that a hospital is liable for injuries to patients caused by the negligence of nurses (Piedmont Hospital v. Anderson, 65 Ga. App. 491, 16 S. E. [2d] 90) and of physicians employed by the hospital (Treptau v. Behrens Spa, Inc. 247 Wis. 438, 20

N. W. [2d] 108; Stuart Circle Hospital Corp. v. Curry, 173 Va. 136, 3 S. E. [2d] 153, 124 A. L. R. 176; 26 Am. Jur., Hospitals and Asylums, § 14).

It does not seem reasonable to us to characterize a resident doctor such as Dr. Finkelnberg as an independent contractor while he performs the routine hospital functions for which he is hired. While the record on this phase of the case is not as detailed as might be desired, it is clear that the residents are paid employes of the hospital. They are assigned to supervise the internes in providing the details of medical service, physical examinations, and necessary treatment with which they are charged; to assist the internes when their capabilities are not sufficiently advanced so that they can do the service themselves; and to report to the attending staff the progress and effects of the treatment. That Dr. Finkelnberg's duties consisted of providing routine hospital medical service between July 1 and July 10, 1947, is made clear by his testimony that he had no reason to consult Dr. Hauser, the staff doctor. The relationship of a resident to the hospital is not unlike that of an interne or nurse. All three groups are specially and highly trained. All three are engaged in supplying the element of trained medical care which distinguishes a hospital from a hotel. Under these circumstances, we must hold that a resident doctor in a hospital who receives his compensation from the hospital while providing medical care as a part of regular hospital routine is a servant of the hospital so as to make the hospital liable for his negligence under the doctrine of *respondeat superior.*

■ We are then brought to a consideration of the contentions of Dr. Hauser. He claims that the mere fact that he was on the hospital staff and that certain resident doctors and internes were subject to his general supervision did not make him liable for their acts and conduct.

An examination of the court's instructions satisfies us that the question of the liability of Dr. Hauser was made to depend on a finding that he himself had been guilty of negligence. Therefore, his argument that he would not be liable under the law for the neg-

ligence of Dr. Finkelnberg or other employes of the hospital does not present an issue which would require a reversal under the circumstances here.

Dr. Hauser also contends that the evidence does not support a finding that he was negligent. The fact is undisputed that Dr. Hauser did not visit Michael during the period from July 1 to July 10, 1947. There is a conflict in the testimony as to the time when Dr. Hauser did see Michael after that time, but we do not consider that material, since the injury here complained of had developed and was discovered by July 10. Dr. Hauser testified that he saw Michael on July 10 in response to a call from Dr. Finkelnberg, and that he saw him almost every day from July 10 to July 22. This testimony is corroborated by the testimony of Dr. Finkelnberg. Dr. Hauser further testified that he talked to Mrs. Moeller, Michael's mother, on July 10. Mrs. Moeller denies this and claims that the first time she talked with Dr. Hauser after July 1 was July 21, when she called him on the telephone. She testified that at that time he expressed surprise that Michael was still in the hospital, since he thought Michael had been discharged.

Dr. Hauser explained that he had not seen Michael between July 1 and July 10 because when he made his last visit on June 30 he had left word with the charge nurse who accompanied him at the time that the traction be removed, a splint applied, and the boy be sent home. He said that Michael's parents were anxious that the boy be discharged so that they could return to their home in Rochester; that that was the usual manner of giving instructions for discharge; and that he felt on June 30 that the fracture had mended sufficiently to allow the leg to be taken out of traction and put in a cast and the boy discharged. Since he thought that these instructions had been carried out and the boy discharged, he did not return to see him until he was called on July 10. He had not been called with reference to the case prior to that time, since last seeing the boy, and he had not inquired whether these instructions had been carried out. He further said that on June 30 no interne or resident doctor had accompanied him on his examination

and that he did not recall the name of the charge nurse to whom he claimed that he had given the instructions for discharge, nor was any nurse produced to testify that she had received such instructions. He testified that he did not talk about discharging Michael to either Dr. Windmiller, the resident who was on duty in June, or to Dr. Finkelnberg, the resident after July 1. The head nurse for the fracture department during June and July testified that each department of the hospital has its own order book, into which are put the orders for each patient which the doctors want the nurses to carry out. She said that if the order to discharge Michael had been given to her it would have been carried out and that if it had been given to someone else and appeared in the order book it would have been carried out.

In our opinion, the evidence, as briefly set out above, made the question as to whether Dr. Hauser had ordered the discharge of Michael on June 30 a fact question for the jury. Under the circumstances relating to the order of discharge, where the doctor did not recall the name of the nurse to whom he claims that he gave the order, where no nurse testified that she received such an order, and where the record book showed no entry of such an order, the jury reasonably may have placed little credence on Dr. Hauser's explanation as to why he failed to visit Michael after June 30.

Assuming that the jury reasonably could have determined that Dr. Hauser did not properly discharge Michael from the hospital on June 30, as the doctor claims he did, we next come to the important question whether the evidence supports a finding that there was a breach of duty on the part of Dr. Hauser which was the proximate cause of Michael's injury.

It seems clear that the jury could have found that the injury to Michael's foot was caused by the failure to make a proper examination at a time when the pressure sore was still superficial. The jury could have found from the evidence that a proper examination of the foot on July 8 or July 9, or even on the 7th, when the boy developed a rash and temperature, would have prevented most of the damage to the foot. Dr. Hauser himself testified that in his

opinion the pressure sore had been developing for a period of 24 to 60 hours before it was discovered in its severity on July 10, and that he felt that the condition could have been discovered on July 9 if an examination had been made. There was other medical testimony that it would have taken even longer—several days—to develop an ulceration such as this. The question then arises: Could the jury reasonably have found that Dr. Hauser was under a duty to see Michael and inspect his foot on July 7, 8, or 9, or even earlier? It is true, as the doctor argues, that Michael was housed in an excellent hospital and was under the care of a qualified physician and nurses. We cannot say, however, as a matter of law, that an attending physician has no duty to call on a patient merely because he is receiving medical care in a hospital. By July 8 or July 9, seven or eight days had elapsed since he last saw the patient on June 30, according to his testimony and that of Dr. Finkelnberg and longer according to the testimony of Michael's mother.

The question for the jury was whether Dr. Hauser had used the degree of skill, care, and vigilance which the average doctor in good standing in the locality would have used under similar circumstances. Bearing in mind the relationship between Dr. Hauser and his patient and the fact that he had not seen him since June 30, it is our opinion that the jury could have found that by this standard the doctor was under a duty to see Michael sometime prior to July 10 and that the breach of this duty was the proximate cause of the injury.

But the doctor might reasonably ask: How could he be charged with any duty in the matter when he claims that he had no knowledge until July 10 that the patient was still in the hospital? It seems to us that this question has been disposed of, inasmuch as the jury could have found, under the testimony, that the patient had not been discharged.

Dr. Hauser argues that the court erred in charging the jury that it was undisputed that he was senior attending physician at the hospital from June 6, 1947, to August 2, 1947. He seriously disputes that matter, on the ground that it was gross error and that

the court directed the jury as a matter of law that the doctor owed some duty to Michael between July 1 and July 10.

We have carefully examined the charge and record as to the so-called undisputed matters, and it is our opinion that there is no reversible error in connection with that phase of the charge. Upon reading the charge as a whole, it discloses that the trial court very fully explained the rights of Dr. Hauser and his claims, including his claim that he had given orders to discharge the patient. It does not appear to us that there was anything in this charge which took away from the jury its function to weigh the evidence and pass on these claims.

We cannot agree with Dr. Hauser's contention that when the court told the jury about plaintiffs' claim that the doctor did not sign a written order for the release of Michael this led the jury to believe that it could find that the doctor had to sign a written order before Michael would be released from the hospital, and that the doctor's failure to make out a written order spelled out a wrong for which he could be compelled to answer in damages. An examination of that part of the charge satisfies us that the court very carefully attempted briefly to review the claims of plaintiffs and, with equal care, those of defendants. This was within the power of the court. We cannot see where the presentation of the matter in the court's charge could be construed by a jury to mean the things suggested by the doctor's contention.

Defendants contend that the rules and regulations of the medical staff (plaintiffs' exhibit A) were used by the court in its instructions to impose legal obligations on Dr. Hauser which the law otherwise would not impose. With this contention we cannot agree. An examination of the court's charge discloses that it repeatedly set out the standard of care required of the doctors, as, for example, that "it is the duty of a doctor in general practice in rendering services to a patient to use that degree of skill, care, and vigilance which an average doctor in good standing in general practice in the general locality rendering the same or similar services would have used." Such an instruction would seem to make it clear that

no greater obligations were imposed upon the doctors than those of an average doctor in general practice in the locality.

Under the facts and circumstances here, we feel that the introduction of the rules and regulations imposed no greater legal obligations on the doctor than those imposed by law. Rather, it would seem that the introduction of these rules and regulations was essential to establish the relationship under the hospital organization between the internes, residents, and staff doctors so as to give the jury a better understanding of the circumstances under which each doctor was performing his medical services.

Certain photographs showing Michael's foot on February 24, 1948, were admitted over the objections of Dr. Hauser, which admission he contends was prejudicial error. These photographs were admitted in connection with the testimony of Dr. Bickel and portrayed a condition which he was attempting to describe. It is our opinion that this evidence was relevant on the issue of the extent of Michael's damage, which included pain and suffering, and its probative value more than outweighed any possible prejudicial effect. There is no indication that the photographs were distorted or were not an accurate representation of the condition of the foot at the time they were made.

In State v. DeZeler, 230 Minn. 39, 46, 41 N. W. (2d) 313, 319, 15 A. L. R. (2d) 1137, this court said:

"* * * Photographs are admissible as competent evidence where they *accurately* portray anything which it is competent for a witness to describe in words, or where they are helpful as an aid to a verbal description of objects and conditions, provided they are relevant to some material issue; * * *."

We have considered the issues raised by Dr. Hauser's motion to strike the testimony of Dr. Bickel made at the conclusion of the presentation of the evidence. Even though parts of his testimony might have been irrelevant, no objections were made at the time the questions were asked. It is our opinion that there was no prejudicial error, inasmuch as the trial judge in his instructions re-

peatedly made it clear as to the standards of care required of each of the doctors involved. As to the status of a motion to strike testimony admitted without objection, this court said in Kouri v. Olson-Keogh Produce Co. 191 Minn. 101, 253 N. W. 98, where such a motion was denied, that there was no error.

We have considered the record in this case with great care, being fully cognizant of its importance not only from the standpoint of the doctors, who constantly perform great humanitarian services for the benefit of their patients, and the hospitals, which furnish a necessary haven for sick and injured people, but also from the standpoint of the patients and the public as well. It is elementary that as an appellate court we cannot pass upon fact situations; we can only determine whether the law has been properly applied. The questions of the duties, care, treatment, and responsibilities of defendant doctors and the County Welfare Board were for the jury. The situation is an unusual one in a malpractice action. Outstanding doctors from two fine hospitals in which the patient received medical treatment differed seriously as to the proper treatment of the patient in order to minimize the possibility of pressure sores which might develop. The jury heard all the testimony and the conflicting views of the doctors, and it was for them to decide the questions of negligence and the amount of damages.

Affirmed.