MOUNDS PARK HOSPITAL, a/k/a N. W. Baptist Hospital Association, Appellant,

v.

Evelyn VON EYE and Dr. E. M. Hammes, Sr., Dr. E. M. Hammes, Jr., and Dr. D. D. Norman, Appellees.

No. 15697.

United States Court of Appeals Eighth Circuit.

June 28, 1957.

Bergmann Richards, Minneapolis, Minn. (Melvin D. Heckt, Greer E. Lockhart and Richards, Janes, Hoke, Montgomery & Cobb, Minneapolis, Minn., on the brief), for appellant.

Lawrence O. Larson, Minneapolis, Minn. (James P. Rorris and Eugene L. Heck, Minneapolis, Minn., on the brief), for appellee Evelyn Von Eye.

James H. Geraghty, St. Paul, Minn. (Lipschultz, Altman, Geraghty & Mulally, St. Paul, Minn., on the brief), for appellees Dr. E. M. Hammes, Sr., et al.

Before GARDNER, Chief Judge, and VOGEL and VAN OOSTERHOUT, Circuit Judges.

GARDNER, Chief Judge.

Appellee Evelyn Von Eye brought this action against appellant Mounds Park Hospital and appellees Dr. E. M. Hammes, Sr., Dr. E. M. Hammes, Jr. and Dr. D. D. Norman to recover damages on account of personal injuries suffered by her by reason of the alleged negligence of said defendants in permitting her to escape from the hospital of defendant Mounds Park Hospital by jumping from a window located on the second floor of the hospital.

The parties will be referred to either by name or as they were designated in the trial court. Plaintiff is the twenty-six year old wife of a South Dakota farmer and the mother of three small children. The defendant Mounds Park Hospital is a private hospital located in St. Paul, Minnesota. It is a hospital caring for medical, surgical, obstetrical and psychiatric patients. The defendant doctors are all specialists known in the profession as psychiatrists.

In her complaint plaintiff alleged that while she was a patient of defendant doctors and was being hospitalized at the defendant hospital the defendant doctors and defendant hospital carelessly, negligently and unskillfully cared for and treated her and that as the proximate result thereof on November 8, 1954, she fell or jumped through a window, causing her numerous and severe injuries. For the injuries so suffered she sought judgment against the defendants jointly and severally.

The defendant doctors filed separate answer denying that they were negligent or that any negligence on their part was the proximate cause of plaintiff's injuries and alleged that if plaintiff sustained injuries and damages as a result of any negligence, such negligence was that of the plaintiff which caused or contributed to cause said accident, or was the negligence of others.

The hospital by its answer denied that it was negligent or that its negligence proximately caused plaintiff's injuries and counterclaimed for hospital services rendered plaintiff.

The action was tried to the court and a jury. At the close of plaintiff's evidence in chief, on motion of defendant doctors, the court directed a verdict in their favor. The defendant hospital did not assert a cross-claim against defendant doctors nor did it allege in its answer that plaintiff's injuries resulted from any negligence of defendant doctors and, hence, the ruling of the court in directing a verdict in favor of the doctors is not properly before us.

At the close of plaintiff's evidence in chief the defendant Mounds Park Hospital moved for a directed verdict on the ground that there was no evidence of any malpractice or negligence on its part which caused or contributed to cause the accident and injuries complained of by plaintiff. The court denied this motion and at the close of all the evidence the

motion was renewed and again denied by the court and the case was submitted to the jury on instructions to which defendant Mounds Park Hospital saved no exceptions but excepted to the denial of certain instructions requested by it to be hereinafter considered. The jury returned a verdict in favor of plaintiff in the amount of $39,380. Defendant Mounds Park Hospital moved for judgment notwithstanding the verdict or in the alternative for a new trial. This motion was denied and defendant has appealed and seeks reversal on the following grounds: (1) the trial court erred in denying the motion of defendant hospital for a directed verdict, (2) if the trial court did not err in denying the motion of defendant hospital for a directed verdict, then the court erred in directing a verdict in favor of the defendants Dr. E. M. Hammes, Sr., Dr. E. M. Hammes, Jr., and Dr. D. D. Norman, (3) the trial court erred in refusing to submit to the jury defendant hospital's requested instructions Nos. X, XIV and XVI as follows:

"X.

"You are further instructed that there is no evidence that plaintiff at any time before her accident on November 8, 1954, had ever attempted to injure herself or other patients or to commit suicide or to escape from the hospital.

"XIV.

"You are instructed that you cannot find that the defendant hospital was negligent in not putting plaintiff in restraints on November 8, 1954, or at any time prior thereto.

"XVI.

"You are instructed that the nurses at defendant hospital were charged with the duty of carrying out the instructions of plaintiff's three doctors except in case of emergency, and you are further instructed that there is no evidence that any emergency existed at any time on November 8, 1954, prior to the time of the actual happening of the accident which required defendant to have placed plaintiff in restraints or to have placed a nurse or guard in constant attendance or to have placed plaintiff in a locked ward."

and (4) the trial court erred in excluding relevant testimony of Dr. E. M. Hammes, Sr., Dr. E. M. Hammes, Jr., and Dr. D. D. Norman, relating to the care exercised by the defendant hospital with respect to the plaintiff on the ground of privilege.

■ Appellant, by moving for a directed verdict at the close of all the evidence, has challenged the sufficiency of the evidence to sustain the judgment. In considering the question of the sufficiency of the evidence to sustain the judgment we must view the evidence in a light most favorable to the prevailing party. We must assume that the jury resolved all conflicts in the evidence in favor of plaintiff and she is entitled to the benefit of all such favorable inferences as may reasonably be drawn from the facts proven and if, when so viewed, reasonable minds might differ as to the facts, then the case presents questions of fact to be decided by the jury and not issues of law to be determined by the court. Gunning v. Cooley, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Chicago Great Western Railway Company v. Casura, 8 Cir., 234 F.2d 441; Chicago Great Western Ry. Co. v. Scovel, 8 Cir., 232 F.2d 952; Wellshear v. Brown, 8 Cir., 231 F.2d 612.

■ While a hospital is not an insurer of a patient's safety it owes its patients the duty of protection and must exercise such reasonable care toward a patient as his known condition may require and the duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity where that mental incapacity is known or by the exercise of ordinary care ought to have been known. Sylvester v. Northwestern Hospital of Minneapolis, 236 Minn. 384, 53 N.W.2d 17. Plaintiff was suffering from schizophrenia with paranoid tendencies and there

was evidence that the behavior of one suffering from schizophrenia with paranoid tendencies is unpredictable and this fact finds support in the evidence in the instant case.

■ Viewing the evidence in a light most favorable to the plaintiff it appears that plaintiff, a twenty-six year old, happily married farm wife and mother of three children, in July of 1954 displayed certain symptoms of mental illness. Her symptoms grew worse and on October 18, 1954, on the advice of her sister, a registered nurse in the employ of defendant hospital, she was brought to St. Paul, Minnesota, to consult Dr. E. M. Hammes, Sr., a psychiatrist. Plaintiff's history was taken in the consulting room of defendant hospital and the doctor recommended that she be admitted to the hospital for observation and on the doctor's recommendation she was so admitted and assigned to a double room on the second floor in the psychiatric department of the hospital. A portion of the first and second floors in defendant hospital is devoted to the care of psychiatric patients. On the first floor of the hospital there is an open and a closed psychiatric department. In the closed department the hall doors are kept locked and the windows are screened and barred. The hospital is "L" shaped and the second floor is traversed by a corridor which is also "L" shaped and passes approximately through the center of that part of the building so that rooms on either side of this corridor open into the corridor. The longer part of the corridor is designated in the record as corridor "A" while the "L" portion of the corridor constituting an extension of corridor "A" is designated as corridor "B". The "L" portion of the corridor is divided into two parts by a door. That portion of the second floor sometimes referred to in the record as the psychiatric department has a capacity sufficient to accommodate thirty-six or thirty-seven psychiatric patients. Plaintiff was assigned to a double room designated as No. 226, which is located so that it opens onto the "L" portion of the corridor,

and there are three rooms intervening between room No. 226 and the angle of the "L" shaped corridor so that the entrance to and from her room could not be seen by one in the so-called "A" corridor unless he were at the angle created by the conjunction of corridors "A" and "B". A portion of the second floor of the hospital was devoted to and constituted the obstetric department. This obstetric department, so-called, was on either side of corridor "B" and the doors of the rooms of that department opened on that portion of the corridor. There intervened between room No. 226 occupied by plaintiff and the nearest room of the obstetric department one room but the so-called obstetric department was in effect separated from the psychiatric department by a door across corridor "B" which was unlocked at all times. That portion of the obstetric department located on the second floor is served by a stairway leading from the second floor to the first floor and thence to a back door, while ingress and egress to corridor "A" is effected by two stairways leading from the second floor to the first floor and thence to the front door of the hospital. The windows in room No. 226 were screened but not barred. At a point about half way between the end of corridor "A" and its conjunction with corridor "B", was located a desk looking toward the "L" angle at which a nurse was ordinarily stationed with apparent supervisory authority.

When plaintiff entered the hospital her mental affliction was diagnosed as "schizophrenia with paranoid tendencies" and this diagnosis was reflected in the hospital's "Progress and Order Sheet" and "Neurological History Sheet". Schizophrenia is one of the most serious of mental illnesses and one afflicted therewith is subject to delusions and hallucinations of sight and hearing. Paranoid schizophrenics believe they are being spied upon and persecuted and that people are trying to harm them. Fluctuations in their condition can occur with great rapidity and their behavior is unpredictable. They may attempt to escape

from their delusions and are subject to unpredictable sudden impulses, such as jumping from windows in escape reactions. They are potentially dangerous to other people, may attack others and may be injured when the person attacked strikes back.

According to defendant hospital's records, plaintiff was generally cooperative during the first seventeen days at the hospital. Commencing on November 4, 1954, however, she became increasingly uncooperative, hostile and disturbed. On the morning of November 4th, Dr. Norman noted in defendant hospital's "Progress and Order Sheet" that plaintiff was "Very hostile—she wants liberties we won't give. If we don't she really will go crazy. She has many secrets about 'two Joan Ellens' but does not care to discuss them." At 4:30 p. m. on November 4th one of the nurses noted in defendant hospital's clinical record that plaintiff "Seems hostile. Keeps speaking of what 'they' won't let her do. Says she can't stand to be cooped up. Will go crazy if she has to stay here." At 8:00 a. m. on November 5th, a nurse noted in the clinical record that plaintiff was "sarcastic at times. Keeps saying 'Why do I have to be locked up here?'" Later in that day Dr. Hammes made the following notation in the Progress and Order Sheet: "Attitude as above. Quite belligerent, fault finding etc. Wants to see husband. Told her we would write him on Monday." At approximately 4:00 a. m. on the morning of November 7th one of the nurses noted in the clinical record of the hospital that "Patient was found hiding on the floor. Says she was afraid because it was so quiet around here." At 4:00 p. m. on November 7th a nurse made the following notation in the clinical record: "Very apprehensive and laughing a great deal." At 11:30 p. m. on November 7th nurse Rydel noted in the clinical record that plaintiff was "Awake when checked, immediately pulled nurse into the room insisting the nurses were listening outside the door and watching patient. Also they were watching her from outside the window.

Wanted to know what the two cars that were parked outside her window were doing. 'Were they watching her too?' Insists nurses have been putting sleeping medications in her water, tying her to the bed with restraints, etc." Nurse Rydel testified that between 11:30 p. m. on November 7th and 2:00 a. m. on November 8th plaintiff called her into the room and said, "Frances, they are torturing you and your unborn baby. They are torturing me, too, and we have got to get out of here." At 4:00 a. m. on November 8th nurse Rydel noted in the clinical record: "Has been awake all nite thus far, but cooperative and quiet. When checked this round patient was sitting in chair and jumped nervously— said 'who's there?'" Between 2:00 a. m. and 2:30 a. m. on November 8th plaintiff walked up corridor "B" to the ladies' bath. Then she walked farther up the corridor to a Mrs. Lorch's room because she "couldn't figure out the car noises", looked out the window and walked farther up the corridor toward the nurses' desk. Plaintiff returned to her room when ordered to do so by one of the nurses. At approximately 4:00 a. m. on November 8th nurse Rydel telephoned Dr. Hammes, Jr., and told him that plaintiff had been awake all night, was upset and restless. Dr. Hammes asked if plaintiff was staying in bed and not disturbing others. He was informed that she was. He then ordered the administration of two grains of sodium luminal inter-muscular to be repeated within two hours if necessary. Nurse Rydel who administered the shot testified that plaintiff "was reluctant about taking it because she thought someone was trying to dope her." On the morning of November 8th the Cardex orders, which contained orders to the nurses regarding the care of patients, specifically stated that plaintiff should be "observed closely". At 7:45 a. m. on November 8th nurse Currier went to plaintiff's room to care for her and found her in the room across the hall where plaintiff had carried her breakfast tray. When she was directed to return to her room "she objected very

much," but did return with nurse Currier. Plaintiff stated, "I don't know why I have to stay in this room." She was "very talkative" and "uncooperative." Plaintiff testified that she refused to take a bath on the morning of November 8th because she thought that she would be electrocuted if she touched anything. At approximately 8:30 a. m. on November 8th one of the nurses took plaintiff to the sun parlor for plaintiff's one hour of sun parlor privileges. Plaintiff testified that after she had been in the sun parlor a half hour she started to walk into a nearby room of a patient listening to a radio. She was then told by a nurse to return to her room and that her time was up. She walked into her room and asked the cleaning woman what time it was. When told that it was approximately 9:25 a. m. she remarked that she had fifteen more minutes to remain in the sun parlor and then left. Apparently she returned to the sun parlor. At approximately 9:30 a. m. nurse Currier went to the sun parlor for the purpose of returning plaintiff to her room. Nurse Currier told plaintiff that her doctor had ordered only one hour of sun parlor privileges. Plaintiff said that she had not been up one hour. Nurse Currier answered that "it was time for her to go back and would she please go." Plaintiff said, "Who is my doctor? You don't even know who he is." Nurse Currier replied, "Mrs. Von Eye, it is time for you to go back to your room." Plaintiff then returned to her room followed by nurse Currier. Plaintiff believes that she went to and from the sun parlor alone.

When plaintiff returned to her room she saw for the first time in the other bed a new patient who was so disturbed that defendant hospital had found it necessary to strap her to the bed. Plaintiff became frightened and ran from her room into corridor "B". She did not see any nurse in corridor "B" and there were no nurses watching corridor "B" during the numerous times between 7:45 a. m. and 9:45 a. m. on the morning of November 8th when plaintiff walked through corridor "B" and into the ad-joining rooms. Nor was there any nurse stationed at the intersection of corridors "A" and "B" in the so-called sun parlor. The nurses' desk was in corridor "A". Plaintiff noticed the door to the obstetric department was open and ajar and walked fast through the door into the obstetric department because she wanted to escape.

She then entered Room 230, the first bedroom in the obstetric department where according to the occupant, a Mrs. Glewwe, the following occurred:

"Plaintiff entered and stood at the foot of my bed. She asked me if I had a baby, and I told her yes. She asked me if it were a boy or a girl and I told her it was a girl but that it had died. She said it was too bad. Then we heard voices in the corridor. She stood behind the door, and started to close it. I told her, no, she couldn't close it because they wanted my door half open at all times. She then stood behind the door, turned around and went 'shh'. I asked her why and she said she had to get out of there, they were trying to hold her there. It seemed to me that something snapped. She put a chair under and against the door knob, and jumped on top of my table. As she started to close the door I turned on my light to call a nurse. As she got up on the table, I went to the door and moved the chair. When I was going through the doorway into the hall she was kicking the window screen. I did not see any nurses in the hall; and I did not see any nurses coming out of the door between the psychiatric department and the obstetric department. I called out, 'Nurse' and I went down the hall yelling for a nurse. When we returned she was either going out the window or had just gone out the window."

The foregoing is largely taken from the records of the hospital entered either by the attending physicians or by the nurses. It is clear from these records that the plaintiff resented the restraint

under which she was kept and that she desired to escape, at least the jury might well have so believed. It is to be noted that the hospital records under date of November 8, 1954, had a special injunction with reference to this patient to the effect that she should be "observed closely". The jury may well have concluded from all the evidence that she was not, at and immediately prior to the time she jumped from the hospital window, being "observed closely". In fact, she was not observed at all by the hospital nurses at or immediately prior to that time. She had wandered away from her room into a room in the obstetric department without having been observed. The occupant of the obstetric room from which plaintiff escaped testified that she went out into the corridor to call for a nurse and that she "went down the hall yelling for a nurse", but apparently none was available.

 Negligence is ordinarily a question of fact to be decided by the jury and we think the acts or omissions here were such as were susceptible of proof by lay witnesses as distinguished from experts. Ellering v. Gross, Minn., 248 N. W. 330; Paulen v. Shinnick, Mich., 289 N.W. 162; Stallman v. Robinson, Mo., 260 S.W.2d 743. The defendant hospital had had forty-seven years experience in nursing and caring for psychiatric patients. These nurses were all experienced in the care of psychiatric patients. They knew, or ought to have known, that the plaintiff desired to escape. The jury might well have believed that they did not observe the admonition that plaintiff be "observed closely", entered on the records of the hospital by the head nurse on the very day of the accident.

It is argued that the defendant hospital was charged only with carrying out the directions of the attending physicians and that as the doctors were found to be without negligence there is no basis in the evidence for attributing negligence to the hospital. The question of the negligence of the attending physicians, in view of the record, is a moot question. The finding of the court that they were without negligence is certainly not a ruling adverse to the hospital, but the hospital has a duty with reference to the nursing and care of its patients and in the performance of these duties it must exercise ordinary care which must be determined by the circumstances attending each case. The question before the court and jury was whether the hospital had, in the circumstances disclosed by the record in this case, exercised ordinary care in the custody, care and supervision of plaintiff. Lack of reasonable care in the discharge of these duties may render the hospital liable regardless of the liability of the attending physician. Swigerd v. City of Ortonville, 246 Minn. 339, 75 N. W.2d 217, 222; Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639; Santos v. Unity Hospital, 301 N.Y. 153, 93 N.E.2d 574; 41 C.J.S. Hospitals § 8(3), p. 349. In Swigerd v. City of Ortonville, supra, the Supreme Court of Minnesota in considering the liability of a hospital for negligence among other things pointed out that:

"Routine acts of treatment which an attending physician may reasonably assume will be performed in his absence by nurses of a modern hospital as part of their usual and customary duties, and the execution of which does not require specialized medical knowledge, are merely administrative acts for which negligence in their performance is imputable to the hospital."

The duty of a hospital in circumstances comparable to those shown in the instant case is succinctly stated by the author of the article on hospitals at 41 C.J. S. Hospitals § 8(3), p. 349, as follows:

"The extent and character of the care that a hospital owes its patients depends on the circumstances of each particular case. A private hospital owes its patients the duty of protection, and must exercise such reasonable care toward a patient as his known condition may require. The measure of duty of a hospital is to exercise that degree of care, skill, and diligence used by hospitals gen-

erally in that community, and required by the express or implied contract of the undertaking. A hospital is liable for want of ordinary care, whether from incompetency of a nurse or failure in duty by a fully qualified nurse. The duty of a hospital toward one for whom it undertakes to care cannot, by agreement with a third person, be reduced below that which the law generally exacts. The duty of care imposed on a hospital extends to safeguarding the patient from dangers due to mental incapacity, and to the use of any instrumentality producing pain. On the other hand, a private hospital is not an insurer of a patient's safety, and the rules as to the care required are limited by the rule that no one is required to guard against or take measures to avert that which a reasonable person under the circumstances would not anticipate as likely to happen."

We conclude that under the applicable law there was substantial evidence to sustain the verdict and it was not error to deny defendant hospital's motion for a directed verdict.

■ It is next urged that the court erred in declining to give three instructions proposed by defendant hospital. The first of these requests was to the effect that there was no evidence that plaintiff at any time before her accident on November 8th had ever attempted to injure herself or other patients, or to commit suicide, or escape from the hospital. The instructions must be considered as a whole and we have carefully examined them and think this request was substantially covered by the instructions given. The court is not required to give instructions in any particular form. The test is whether they fairly and fully present the issues to the jury. 5 Moore's Federal Practice (2d Ed.), p. 2507.

The next instruction requested was to the effect that the jury could not find under the evidence that defendant hospital was negligent in not putting plaintiff in restraints on November 8th or at any time prior thereto. Here again, viewing the instructions as a whole, we think the court in effect gave this instruction in its own language.

■ The next instruction requested was to the effect that the nurses at defendant hospital were charged with the duty of carrying out the instructions of plaintiff's attending physicians, except in cases of emergency, and that there was no evidence that any emergency existed at any time on November 8th prior to the time of the happening of the accident which required defendant to have placed plaintiff in restraints, or to have placed a nurse or guard in constant attendance, or to have placed plaintiff in a locked department. We do not think this instruction could properly be given in view of the evidence. Whether or not an emergency existed was, we think, a question of fact to be determined by the jury, and the duty of defendant hospital in the care, custody and supervision of plaintiff was not strictly limited to following the doctors' instructions. The requested instruction was tantamount to directing a verdict for defendant hospital. The instructions considered as a whole fully and fairly covered all the defenses relied upon and were eminently fair to defendant.

■ It is finally urged that the court erred in excluding testimony of plaintiff's doctors regarding the degree of care exercised by defendant hospital. The testimony was rejected on the ground that it was privileged. Offer of proof was then made and it coincided exactly with testimony of three other expert witnesses offered and received on behalf of defendant hospital. This testimony stood without dispute. In these circumstances we need not consider whether the testimony was privileged because its exclusion could not have been prejudicial. The contention is wholly without merit.

We have considered all other contentions urged by appellant and find them without merit. The judgment appealed from is therefore affirmed.