**Lawrence PLOOF, b.n.f. Albert Ploof**

v.

**Dr. George BROOKS, Superintendent, Vermont State Hospital, Dr. Claire O'Shea, Staff Psychiatrist, Vermont State Hospital.**

**Civ. A. No. 6215.**

United States District Court, D. Vermont.

March 30, 1972.

John A. Dooley, III, Vermont Legal Aid, Burlington, Vt., for plaintiff.

William Keefe, Asst. Atty. Gen., State of Vermont, Montpelier, Vt., for defendants.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT

HOLDEN, Chief Judge.

This action was instituted in behalf of the plaintiff, a minor, by his father. He seeks declaratory and injunctive relief with compensatory damages arising from his confinement as a patient in a ward known as Osgood III at the Vermont State Hospital at Waterbury during October 1970. The defendant Brooks is the superintendent of the state hospital. The defendant O'Shea is a staff psychiatrist at the institution.

The complaint alleges he was subjected to cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and was denied due process of law guaranteed by the Fourteenth Amendment. There is a further claim that the humane treatment guaranteed by 18 V.S.A. § 7703 of the

Vermont Mental Health Law has been violated.[1] Jurisdiction is invoked on the provisions of 28 U.S.C. §§ 1331 and 1343(3).

The cause was heard at Burlington on February 23, through February 25, 1972. At the close of the evidence, at the request of the plaintiff, the court visited and conducted a view of Osgood III at the state hospital on February 26. Upon consideration of the evidence presented, the court reports its findings of the facts.

### FINDINGS OF FACT

The plaintiff was born on November 23, 1954. He was adjudged a delinquent child on August 3, 1970, under the provisions of the Vermont Juvenile Procedure Act, for having possession of stolen property. Upon this adjudication, he was subsequently committed to the custody of the Commissioner of Correction and transferred to the Weeks School at Vergennes, Vermont on August 18, 1970. The Weeks facility is a state school for training and rehabilitation of juvenile delinquents. 28 V.S.A. § 401.

The plaintiff was distressed at this disposition. He informed the social worker, Miss Ann Clark, who had previously been assigned to this case, that he would run away. Also, he told Miss Clark he would threaten suicide in order to get transferred to the Vermont State Hospital. Soon after his arrival he did threaten suicide and physical harm to others. He was transferred to the state hospital on August 26, 1970.[2]

The statement of Dr. William Young, a physician serving the Weeks School, which accompanied the transfer, certified that the plaintiff was mentally ill and, in his opinion, isolation could be dangerous since the plaintiff had threatened to kill himself. Dr. Young entertained some doubt about the plaintiff's expressed determination to inflict self harm. A letter from the superintendent of Weeks School indicated that the plaintiff had paranoidal tendencies.

The admitting physician at the state hospital certified the patient to be mentally ill and in need of hospitalization. The plaintiff's condition was diagnosed "Transient Situation Disturbance. Adjustment Reaction of Adolescence." The diagnosis brought him under the care of Karl Treial, M.D., chief of service, in charge of the ward, Weeks II–A, to which the plaintiff was assigned. The defendant Claire O'Shea, M.D., worked under Dr. Treial's direction and supervision. Her professional service is with child and adolescent patients. In this assignment she was aided by a psychiatric technician and social worker.

During August and September 1970, the plaintiff exhibited a propensity "to raise hell in the wards." He refused to participate in an educational program arranged for by Dr. O'Shea at the Harwood Union High School at Waterbury. He experienced difficulty with hospital aides and attendants. On one occasion he struck an aide. The plaintiff explained he was "just fooling around." At times he became upset and abusive. This resulted in his being placed in seclusion for brief periods. The hospital used such restriction as a means of modifying his behavior to aid in self control. This restraint was imposed on one occasion following an "elopement." See, 18

---

1. 18 V.S.A. § 7703 provides: Every patient shall be entitled to humane care and treatment and, to the extent that facilities, equipment, and personnel are available, to medical care and treatment in accordance with the highest standards accepted in medical practice.

2. 18 V.S.A. § 7905 provides: When in the opinion of the superintendent of the Weeks School an inmate of that school is mentally ill or defective and should properly be cared for at the Vermont State Hospital or the Brandon Training School, he may apply to the commissioner for an examination of that person, and if, in the judgment of the commissioner, that person should be transferred to the hospital or training school, he may order the transfer in writing for the remainder of his term of commitment or until his return to the Weeks School by further order of the commissioner.

V.S.A. § 7105. The hospital records for the period indicate there was no significant potential for suicide nor for violence toward others.

On October 1 the plaintiff was released for a six month period to enable him to obtain work by participation in the Neighborhood Youth Corps program. He refused to attend the program but did do odd jobs in the Burlington area. His leave was terminated on October 27, 1970. He was returned to the state hospital and placed in the same unit to which he previously was assigned.

The plaintiff, at this time, was approaching his sixteenth birthday. He was six feet two inches tall and weighed one hundred fifty four pounds. He was severely angered by his return to the hospital, was abusive and refused to cooperate with the hospital staff. The tension increased on October 28 and his agitation became extreme. He refused medication and became abusive toward other patients and the staff. He stood over Miss Harris, the social worker, in a threatening attitude. Late in the afternoon the defendant O'Shea sought counsel with her supervisor. They discussed a transfer from an open ward to seclusion in either of two locked wards under Dr. Treial's charge, Wards 2–A or Osgood III.

Ward 2–A had no available beds. Osgood III had beds and adequate staff. Since seclusion is not safe for a highly agitated patient unless he can be watched and attended, Dr. O'Shea decided on Osgood III. The plaintiff was not informed of the reason for his transfer to this ward. Neither was he given the opportunity to object. The hospital administration requires that no patient can be restricted except by authorization of a staff medical doctor. There was no organized appeal procedure from the psychiatrist's decision for such a transfer.

Osgood III is a security ward for male patients who, because of their mental illness, require more control over their behavior than was possible in open ward facilities. Its population was fifty eight on October 28, 1970. The patients in this ward suffered from various mental defects and illnesses. Their ages ranged from sixteen to seventy. The ward includes those suffering from severe retardation, extensive brain damage and severely deteriorated schizophrenics. Some persist in disrobing. Others are unable to exercise bowel and urinary control. The patients in this ward were among the most pitiful cases at the hospital.

Younger patients with less serious problems are usually transferred to Ward II–A, but when this ward is full such patients are placed in Osgood III on a temporary basis. This situation prevailed at the time of the plaintiff's transfer on October 28, 1970.

Osgood III is contained in about a dozen rooms which include three dormitories, three single rooms, a dining room, kitchen, an office and attendant's station, laundry room and a room containing bath and toilet facilities. Access to these rooms is by way of a corridor which terminates in a large room with adjacent sun porch. The single rooms and dormitories contain only beds and are kept locked during the daytime. The open day room is furnished with wooden chairs, straightback and rockers. When in repair, television, radio and tape records are provided. Except at mealtime, the patients congregate and spend the hours from breakfast until lights out at 9:00 P.M. in the day room. In good weather, patients were permitted outside in the company of attendants.[3]

The plaintiff was restricted to this ward from late afternoon of October 28 until removed the morning of October

---

3.  At the time of the court's view, the ward was clean and orderly. The patients were in the dining room, eating the noon meal.

One patient, who was secluded in a single room, was disrobed and lying down.

30. During this period he observed patients who disrobed. They were not allowed to remain in this condition. Some patients sought to touch him. Some cried out; others were withdrawn. Not all used the toilet facilities and, at times, he was subjected to the odor from urine and fecal matter. Some patients hit their heads against the wall. At times the dining room was disorderly and the plaintiff asked and was given permission to work in the kitchen where he was not required to eat with other patients.

When Dr. Treial tried to visit with the plaintiff in this ward the patient insulted him. Dr. O'Shea visited the plaintiff in Osgood III on the morning of October 29 and assured him he would be transferred to Ward II–A as soon as facilities there were available. He became pleased and his anger subsided.

The hospital record (Pltf.'s 2) during the time the plaintiff was in Osgood III contains the report of the attendant in charge (Def.'s Ex. 13). It records: "Pt. (Ploof) has been quiet and cooperative, worked very good in dining room and other ward work. Read some. Was good with this type patients." It also reports that the patient received medication on October 29.

The plaintiff was transferred to Ward II–A on October 30. He was subsequently returned to Weeks II, where he remained until discharged August 2, 1971, after having been "on visit" since February.

The plaintiff testified his experience at Osgood III brought on recurrent nightmares while at the hospital, and since his release. However, he has made no complaint to any members of the hospital staff, nor to his parents, nor to his case worker from the state department of social welfare with whom he had an understanding in cooperative relationship. The evaluation report in the hospital records for the period ending November 27th stated that plaintiff was in good health, appetite normal, with no evidence of insomnia nor hallucinations.

Nancy Ames Curtis, M.D., who was formerly a resident psychiatrist at the state hospital, was called as a witness for the plaintiff. She had not examined the plaintiff. While she had not specifically observed the effect of Osgood III on mental patients, she offered the opinion that for patients who were not mentally ill, confinement in Osgood III would be traumatic.

■ The court finds that plaintiff's transfer to Osgood III for a period of less than two days did not produce a continuing oppressive anxiety or overwhelming fear. Neither did the episode induce hallucinations.

The defendant Brooks did not participate directly in the decision of Doctors Treial and O'Shea to transfer the plaintiff to Osgood III. After reviewing the full hospital record, he determined the transfer was consistent with hospital policy.

The decision of Dr. O'Shea, acting in consultation with her supervisor, which brought about the plaintiff's confinement in Osgood III, was based on her professional judgment in the situation which confronted her on the afternoon of October 28, 1970. The plaintiff's extreme tension, his agitation, his history of suicidal threats and his hostile and abusive attitude toward the staff indicated to her that control of this patient's behavior was essential to his welfare and that of the orderly administration of the hospital facility. Her judgment indicated that his continued presence in an open ward at this particular time jeopardized these interests. The selection of Osgood III over Ward II–A was dictated by the lack of adequate staff and available beds in the Ward II–A.[4]

---

4. The hospital records (Plaintiff's Ex. 2) report as of April 20, 1971
    PROGRESS NOTE: Review of Larry's attitude towards other patients.

One aspect of Larry's attitude that was in need of more control was his sadistic antagonism to confused patients on the open ward. On Weeks 2 he abused the

The plaintiff's confinement in Osgood III was not for the purpose of punishment. It was for control, when controlled behavior appeared reasonably imperative. The decision to transfer and restrict the plaintiff in this unpleasant part of the hospital facility was not made nor executed out of malice nor for the purpose of punishment.

### Conclusions of Law

The legal validity of the plaintiff's transfer from the Weeks School, although referred to in his post hearing memorandum, is not included in his complaint. Since the issue was not raised there, nor at the trial, it is not the subject of the court's findings and judgment order.[5]

■ The limited scope of judicial review of hospital decisions necessarily assumes the good faith and expertise of the hospital staff. Covington v. Harris, 136 U.S.App.D.C. 35, 419 F.2d 617, 621 (1969). Bazelton, C. J.

■ The court's function is not to decide whether the hospital staff made the best decision. Rather it is to determine whether "it has made a permissible and reasonable decision in view of the relevant information and within a broad discretion." Tribby v. Cameron, 126 U.S.App.D.C. 327, 379 F.2d 104, 105 (1967), Jones v. Robinson, 142 U.S.App. D.C. 221, 440 F.2d 249, 251 (1971).

The plaintiff's evidence directed to this point fails to establish that the defendants' action in restricting the plaintiff was inspired by ill will. To the contrary, the total evidence indicates the defendants acted on reasonable cause under the tensive circumstances which prevailed at the time the order was issued and executed.

■ The plaintiff's transfer from Weeks School to the state hospital at Waterbury was dictated by the diagnosis of mental illness and his need for therapeutic treatment. And while restriction may be permissible as means of behavioral control, it cannot be sustained if it offends the "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U. S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630; Sostre v. McGinnis, 442 F.2d 178, 190–191 (C.A.2 1971). And the infliction of penal sanctions as a consequence of mental illness may constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758, 763.

The court is mindful that prolonged confinement of one afflicted by moder-

---

feeble patients repeatedly by taunting them, swearing at them, adding to their confusion in time or place and he did not modify this behavior when chided. This is confirmed by Mr. Jones, charge on Weeks 2 and Mr. Schayltz, afternoon charge who saw many instances of this and is recorded on the yellow charts.

On Osgood 3 Mrs. Archer and Mr. Farnham both noted that Larry was very angry the first day he was transferred to the closed ward and uncooperative but the next morning, the second and third day of his stay, he was full of cooperation, kindliness to the other patients and sought out ways to be useful on the ward. The attitude on Osgood 3 is that "it is too bad the patients are the way they are but they can't help it." No teasing of the backward patients is tolerated by the aides but really made no overt attempt that they saw to torture other patients. He did a lot of ward work. He offered

to work in the kitchen and after his transfer to 2–A, our other closed ward, he himself asked to be placed for work placement six hours a day on Osgood 3. This was not done but indicates that Larry himself liked his role on Osgood 3. He did indeed seem to benefit and the transfer to Osgood 3 and then 2–A seemed to staff to be distinctly beneficial and modifying his behavior and at the time regarded by him as punitive.

s/      Clare  O'Shea
(Clare  O'Shea,  M.D./kf)

5. In habeas corpus proceedings concerning involuntary transfer of juveniles from Weeks School, see In re Rich, 125 Vt. 373, 378, 216 A.2d 266. As to involuntary transfer of prisoners to a state institution for criminally insane, see United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1073 (C.A. 2 1969).

ate mental illness with those who are dangerously insane may produce agony that exceeds reasonable and lawful limits. See, United States ex rel. Schuster v. Herold, 410 F.2d 1071, 1078–1079.

■ Continuing failure to provide suitable and adequate treatment for a patient involuntarily committed to a mental institution is not to be excused in federal habeas corpus proceedings for lack of staff and facilities. See, Rouse v. Cameron, 125 U.S.App.D.C. 366, 373 F.2d 451, 457 (1969).

■ Intra-hospital dispositions involve considerations of hospital administration which are entrusted in the first instance to the hospital staff. Nonetheless, restrictions beyond those which obtain in the usual hospitalization must be founded on reasonable justification. Covington v. Harris, supra, 419 F.2d at 624.

The plaintiff's transfer to Osgood III was not prolonged. It was done as a temporary expedient when the transfer to the alternative ward was not available. The patient was transferred to Ward II–A at the earliest opportunity. And this procedure was consistent with the provisions of 18 V.S.A. § 7703 "—to the extent that facilities, equipment and personnel (were) available."

The shortage in facilities and personnel which prevailed in the afternoon of October 28, 1970 cannot be assigned to either of these defendants. The responsibility for these deficiencies would appear to reside with the State in failing to adequately supply the means to carry out the humanitarian concept of the Mental Health Law expressed in section 7703.

■ The final question is whether the transfer to Osgood III deprived the plaintiff of the essential demands of due process. It appears that the plaintiff was not informed of the reason for his transfer. It also appears that the plaintiff went out of communication with the defendants on the afternoon in question and apparently he made no inquiry as to the reason for his transfer. Compare, Williams v. Robinson, 139 U.S.App.D.C. 204, 432 F.2d 637, 644 (1970). The exigencies of the situation did not leave room for the appointment of a neutral investigator. See, Jones v. Robinson, supra, 142 U.S.App.D.C. 221, 440 F.2d at 251 (1971). And if the plaintiff's prior threats of suicide were real, not feigned, the defendants owed the plaintiff the duty of immediate protection from self-inflicted danger. Mounds Park Hospital v. Von Eye, 245 F.2d 756 (C.A.8, 1957) 70 A.L.R.2d 335, 341.

In general, "—due process embodies the differing rules of fair play, which through the years, have become associated with differing types of proceedings. Whether the Constitution requires that a particular right obtain in a specific proceeding depends upon a complexity of factors. The nature of the alleged right involved, the nature of the proceeding, and the possible burden on that proceeding, are all considerations which must be taken into account." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1515, 4 L.Ed.2d 1307, 1321 (1960).

The need for swift control and the interest of orderly hospital procedure in the present case afforded little opportunity for the employment of extensive investigation procedure. And while intra-hospital disposition is not beyond all judicial review, to demand extensive investigative procedure in the facts presented in the instant case would unduly burden the administration of the facility to the detriment of other patients committed to its charge.

*Judgment*

The defendants Brooks and O'Shea have not caused the plaintiff to be subjected to the deprivation of any rights or privileges secured by the Constitution and law of the United States. The defendants are not liable to the plaintiff in law or equity, as alleged in his complaint.

Judgment for the defendants.