# P. M. BYLUND v. J. E. CARROLL.[1]

November 4, 1938.

No. 31,686.

[1]Reported in 281 N. W. 873.

*Dell & Rosengren,* for appellant.

*Johnson, Sands & Brumfield* and *Nesbitt, MacPhail & Miller,* for respondent.

*William S. Ervin,* Attorney General, *Ordner T. Bundlie,* Assistant Attorney General, and *Louis B. Brechet,* Special Assistant Attorney General, *amici curiae,* filed a brief on behalf of the State of Minnesota.

HOLT, JUSTICE.

Plaintiff appeals from the order denying his motion for a new trial after verdict for defendant.

The action is to recover damages for personal injuries. The complaint alleged that on November 14, 1933, while plaintiff was at work repairing trunk highway No. 10, a few miles southeast of Morris, defendant carelessly and negligently drove his automobile against plaintiff, causing severe and permanent injuries; particularly that defendant failed to keep a proper lookout, and failed to keep the automobile under control with due regard to the work being done at that point on the highway; that he knew plaintiff and other men were busily engaged in their work; that he drove at excessive speed without giving warning of his approach and failed to exercise ordinary care when he found himself in position where he was about to cause injury to plaintiff. The answer admitted that he drove his automobile upon trunk highway No. 10 at the point stated in the complaint, and alleged that plaintiff suddenly and without warning jumped from a place of safety into the path of and collided with the automobile then and there being driven by defendant, alleged that defendant did not breach any duty toward plaintiff, and averred that plaintiff was guilty of negligence which proximately contributed to his injuries.

The evidence showed that in the middle of the forenoon of the day and at the place mentioned, a clear, cold day with the wind from the northeast, on this trunk highway, there running south-easterly from Morris to Hancock, plaintiff was in a crew of four, filling the cracks on the west half of the 18-foot wide cement-paved highway. In the operation the crew used a motor truck with the usual cab and a body which could be unloaded by raising the front and tipping it back. A cart with a tar kettle was attached to the truck by a V-shaped four-foot tongue. The tar kettle was about four feet square, the top four and one-half feet from the ground, with a kerosene tank in front by which the tar kettle was heated. The kettle was provided with a lid so hinged that either the front half or the rear half could be lifted. Among other matters carried in the truck was a steel drum of tar, sawed into three equal parts, each part weighing about 150 pounds. When the tar in the kettle needs replenishing, the men slide one of these 150-pound pieces upon the tailboard of the truck over onto the kerosene tank, which is slightly lower than the tar kettle, then ease it over the rim of the tar kettle and thereinto. When this is done the truck is at rest. The width of the truck over all was six and one-half feet, and that of the kettle cart about five and one-half feet. The color of the truck was the usual yellow adopted by the highway department. On its left front a sign two feet square was affixed, bearing the words "Men Working," in large letters. The truck by a rope 200 feet long pulled a sled, and on the sled a sign similar to that in front of the truck was placed on a steel standard so that drivers of vehicles approaching the truck from behind could see the warning "Men Working." On the sled and on the truck in front were two red flags to warn of the situation. There was a black line about three inches wide marking the center line of the pavement. As the truck moved southeasterly on the west half of this cement pavement, at the rate of about a mile an hour, the three men with buckets having suitable nozzles would fill the buckets with hot tar drawn from the rear of the tar kettle and pour it into the cracks of the pavement to the west of the marked center line thereof, working from the sled toward the rear of the tar kettle. The east half of

the pavement was left free for traffic. It being a cold day, the nozzles of the buckets clogged, and it was necessary to stop the truck not only for replenishing the tar in the kettle but also to enable the men to thaw out the nozzles on their buckets. It had so stopped when defendant approached from the southeast, driving on the easterly half of the pavement. He was driving at about 45 miles an hour until, when within about 500 feet of the truck, he discerned its character and slowed down, passing the front of the truck at a speed of 25 to 28 miles per hour, his estimate, and 30 miles an hour, the estimate of the driver of the truck. Defendant testified he saw no men, except the driver of the truck, in the cab, until plaintiff backed into the cowl of his car. The glass in the front door was shattered and the handle bent back. Plaintiff's injuries were such that he claims to have no recollection now of what occurred on the day of the accident. His memory is a blank from the evening of the day before the accident until the time he regained consciousness in the hospital. The testimony of Toombs and Johnson, who, with plaintiff, were placing the 150-pound tar piece in the kettle, was substantially this: They, because of the direction of the wind, were standing easterly of the car tongue, Toombs at the corner of the car, Johnson next, and plaintiff next, close to the tailboard of the truck. The men were standing facing westerly and close together so that they all could reach the tar slab they were sliding into the kettle. As it was slid in, Toombs turned to the right and was walking toward the rear of the car and about two feet west of the center line of the pavement. Johnson turned, as did Toombs, and had taken a step or so to follow when the body of plaintiff was hurled against him, throwing him down. Neither one of the two saw how plaintiff turned or came in contact with defendant's car; neither did Shippey, the driver of the truck. It is clear that the pleadings and the testimony present two fact issues, defendant's negligence and plaintiff's contributory negligence. The verdict was for defendant, and it should be final unless plaintiff shows prejudicial error in the trial.

The assignments of error are: Unduly restricting the cross-examination of defendant when called as plaintiff's first witness; error

in permitting defendant to call and examine Thompson as an adverse witness; error in refusing to give some 20 instructions requested by plaintiff; error in refusing the jury's request for further instruction upon the proposition presented by them; and misconduct of opposing counsel.

The statute, 2 Mason Minn. St. 1927, § 9816, permits the calling of the adverse party for cross-examination. But such cross-examination is nevertheless within the reasonable control of the trial court. Here defendant was called as plaintiff's first witness, and the court ruled that at that stage of the trial his cross-examination should be confined to eliciting facts which were within the knowledge of defendant to the exclusion of such as plaintiff could reasonably be expected to have proof of at hand. Otherwise the cross-examination under the statute readily degenerates into a fishing expedition unduly prolonging the trial. The statute provides that the examination is "subject to the rules applicable to the examination of other witnesses." It is true, the statute is remedial, to be construed and applied with reasonable liberality. Strom v. Montana Cent. Ry. Co. 81 Minn. 346, 84 N. W. 46. But that does not mean that the party calling the adversary for cross-examination may ask any question desired without regard to the issues tried or the status of the trial. Plaintiff was permitted fully to examine the witness as to how he was driving, as to signals he failed to give, as to the condition of his car, as to what he saw of the truck and the signs it bore, and of the men working. The court ruled out, and properly so, argumentative questions. Defendant's cross-examination disclosed that he noticed and knew from experience that the parked truck he was meeting was one used by the highway department in road work and carried the usual warning signs, that he saw the sign "Men Working" at least 100 feet before reaching the front of the truck, and that he anticipated that men might possibly be working behind the truck. In fact, it was a most thorough cross-examination of defendant as to his knowledge concerning every issue presented by the complaint. When defendant took the stand in defense he was again subjected to the most searching cross-examination on every conceivable controverted fact. As said in Lyman v.

Hermann, 203 Minn. 225, 280 N. W. 862: "That the court restricted the plaintiff's counsel in the examination of defendant when called for cross-examination under the statute to matters within his knowledge and of which plaintiff had no proof at hand was largely a matter within the discretion of the trial court. There is nothing in the record to show abuse of discretion to plaintiff's hurt in the ruling excepted to." That statement is applicable here. We appreciate that a plaintiff may, if he can, prove his cause of action by cross-examination of the defendant. Waller v. Sloan, 225 Mich. 600, 196 N. W. 347.

The claim that there was error in permitting defendant to call and examine Mr. Thompson as an adverse witness is without foundation. The court ruled that he had no right to so examine and excluded exhibit 11, a report he signed of the accident. Plaintiff moved to strike out all the evidence given by Thompson. But no assignment of error reaches that ruling; and the record does not show that it was raised in the motion for a new trial. Moreover, we see nothing in Thompson's testimony prejudicial to plaintiff.

Plaintiff requested some 20 instructions relative to his right as a workman upon the highway to assume that drivers of vehicles thereon would use ordinary care for his protection and guard against emergencies that might arise from the work. In this case the evidence presented the fact that plaintiff and fellow workmen had marked out a portion of the west half of the pavement as the place whereon the work was being done and that the east half was free for traffic, and that defendant ascertained this situation fully when he came within reading distance of the sign on the left front of the truck. In that situation we think these extracts from the general charge show adequate instructions on the propositions of defendant's negligence and plaintiff's contributory negligence:

"Whether a person has exercised ordinary care, of course, is to be determined in view of all the facts and all the surroundings as brought out by the evidence in this case. There is to be considered the situation of affairs at the time, the liability to danger, the extent, character, and nature of the danger, and the more or less disastrous

consequences that might be expected to follow from a want of care. The care in each case must be commensurate to the risks of the situation. * * * In this particular case the claim of the plaintiff, as I have already outlined, is that the defendant was operating his car at an unreasonable rate of speed, failing to keep the car under control, failing to keep a proper lookout, or failing to give a timely signal. * * * As I have already stated, in considering this question of whether or no the plaintiff was guilty of negligence, you have a right, or should, members of the jury, take the situation as it applies to this particular case, the situation of the plaintiff and the operation of the defendant's car at the time and place of the accident. Consider, also, the question of the employment of defendant [plaintiff] at the time, and just what he did or what he should have done under the circumstances, in considering the question of whether or not he was guilty of any act of negligence which contributed proximately to the accident itself."

In view of the fact that the plaintiff's evidence was that there was no splashing of tar when the piece was slid into the kettle, there was nothing requiring an instruction as to conduct in case of an emergency arising in the employment. This was not a case where workmen were at work generally on the entire street or highway such as in those cited by plaintiff of State Compensation Ins. Fund v. Scamell, 73 Cal. App. 285, 238 P. 780; Lozio v. Perrone, 111 N. J. L. 549, 168 A. 764; Ferguson v. Reynolds, 52 Utah, 583, 176 P. 267; Chaney v. Moore, 101 W. Va. 621, 134 S. E. 204, 47 A. L. R. 800; Dinan v. C. & M. Elec. Ry. Co. 164 Wis. 295, 159 N. W. 944. Here the part of the highway on which men were working was designated and withdrawn temporarily from travel.

After some deliberation the jury came in for further instruction, the attorneys not being present, stating:

"Judge, your Honor, there has a question come up that we would like a little advice on, and that is a point if in our minds there is a situation of negligence, contributory negligence on the part of the state in providing proper warning signals, if that bars plaintiff from collecting.

The Court: "I am afraid I can't answer that question for you. That didn't enter into the lawsuit at all."

The court's answer to the inquiry was right. There was not the slightest intimation in the testimony of any negligence on the part of the state or its highway department. Defendant admitted that in ample time before passing the truck he knew from the appearance and the reading of the sign "Men Working" what the situation was. It is difficult to suggest any other instruction than the one given to the jury's question.

The claim that in the futile attempt of defendant's counsel to be permitted to examine his witness Thompson as an adverse witness counsel was guilty of misconduct to plaintiff's prejudice we consider not meriting notice.

The order is affirmed.

[1]Reported in 281 N. W. 877.