Dan F. THOMPSON, Appellant,

v.

C. Walton LILLEHEI et al., Appellees.

Geraldine B. THOMPSON, Appellant,

v.

C. Walton LILLEHEI et al., Appellees.

Nos. 16216, 16217.

United States Court of Appeals
Eighth Circuit.

Dec. 28, 1959.

Harry H. Peterson, Minneapolis, Minn., for appellants, Edward R. Kenneally, Minneapolis, Minn., on the brief.

O. C. Adamson, II, Minneapolis, Minn., for appellee Lillehei.

Frank X. Cronan, Minneapolis, Minn., for appellee Joseph Buckley.

Frank Janes, Minneapolis, Minn., for appellee Richard Varco.

Hyman Edelman, Minneapolis, Minn., for appellee Warden.

Before GARDNER, VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

This diversity litigation, filled with human drama, has its genesis in an attempt to perform open heart surgery upon Leslie Ann Thompson, the minor daughter of Dan F. Thompson and Ger-

aldine B. Thompson [1] who were the unsuccessful plaintiffs in the trial court.

These actions were commenced against the University of Minnesota, its Board of Regents and six medical doctors, who are or were members of the faculty of the University of Minnesota Medical School. Mr. Thompson seeks to recover $300,000 and Mrs. Thompson $250,000, as compensation for damages allegedly sustained as the result of injuries to Mrs. Thompson, claimed to be the result of negligence in the performance of medical procedures. Prior to the trial, the actions were dismissed by the trial court as to the University of Minnesota and the Regents of the University, each being a state governmental body and immune from suit. While the record before us does not so indicate, it is apparent that these cases were consolidated for trial. At the close of plaintiffs' case, the court granted the motions of defendants Earl Schultz and James Matthews for directed verdicts, and they passed out of the picture. The issues were submitted to the jury as to defendants C. Walton Lillehei, Richard Varco, Herbert Warden and Joseph Buckley, their motions for directed verdicts offered at the close of the whole case having been denied. The jury was unable to agree upon a verdict and was discharged. Thereafter, the four defendants filed motions for judgment notwithstanding the failure of the jury to agree, Rule 50(b), Rules of Civil Procedure, 28 U.S.C.A., and in due time, the trial judge granted the motions and entered judgments for the defendants, holding (1) there was no evidence of actual negligence on the part of the four defendants against whom the cause was submitted; (2) the defendants are not vicariously liable for the alleged negligence of someone in the operating room; (3) no proof of proximate causation. See Thompson v. Lillehei, D.C.Minn., 164 F.Supp. 716.

In testing the legal sufficiency of the evidence to make a submissible case, which obviously is the basic question confronting us, we are required to view and consider all of the evidence from the standpoint most favorable to plaintiffs, and give to them the advantage of every fair and reasonable intendment that the evidence can justify. With this firmly entrenched principle in mind, we give further attention to the factual situation.

At the time of the occurrence giving rise to this litigation, Leslie Ann was eight years old. She was afflicted with a congenital defect in her heart, known medically as a ventricular septal defect, described in a layman's language as a hole or opening between the two pumping chambers of the heart. Prior to 1954, due to inability to operate within the heart, such children were doomed to an early death. However, after much experimenting on animals, members of the faculty of the Medical School of Minnesota at the University of Minnesota Hospital, were able to perfect what is known as "control cross-circulation," and on March 26, 1954, successfully repaired a congenital defect in the heart of a little girl by means of this procedure. This cross-circulation technique requires a donor, whose heart and lungs are used to pump and purify the patient's blood, thus effecting a reciprocal exchange of blood between the patient and donor. The cross-circulation is established through tubes which extend from large veins and arteries in the donor to appropriate veins and arteries in the subject under surgery. This method of giving life to the patient makes it possible to stop the function of the patient's heart and lungs while the operation is in progress.

A few months after the first successful operation, in May or June, 1954, Mr. Thompson, who was a Lieutenant Colonel in the United States Air Force, first contacted Dr. Lillehei and made arrangements, principally through Dr. Lillehei, for an operation upon Leslie Ann to cor-

---

[1]. In the interest of brevity we hereinafter refer to these parties as Leslie Ann; Colonel or Mr. Thompson; Geraldine or Mrs. Thompson, respectively. Mr. and Mrs. Thompson, when jointly referred to shall be designated as plaintiffs.

rect her congenital heart defect. This contemplated operation upon Leslie Ann was to be the seventeenth of its kind.[2] Mrs. Thompson, the mother, was to serve as the donor. The operation was scheduled for October 5, 1954; at about 7:20 a. m. that day Leslie Ann was anesthetized by defendant Joseph Buckley, M. D., an anesthesiologist, and associate professor in the University Medical School. Drs. Lillehei and Varco who were to perform the actual operation upon Leslie Ann appeared a short time later. Operative procedures upon Leslie Ann preparatory to the actual heart surgery took approximately two and one-half hours. At about 8:20 a. m. Mrs. Thompson was anesthetized in another room, presumably by a Dr. Uri, who is not a defendant in this action. This procedure encompassed not only the administration of anesthesia but attachment of intravenous equipment or apparatus, referred to as "I.V." to the donor. The I.V. included bottles containing solution, filters, and needles for insertion into veins. All of this was completed when Mrs. Thompson was wheeled into the operating room. By this time Drs. Lillehei and Varco had been operating on Leslie Ann for more than an hour.

Other participants were Dr. Ludwig Uri, who was the anesthesiologist in charge of Mrs. Thompson; Herbert Warden, M. D. and Morley Cohen, M. D. were the surgeons who made the cannulations upon the donor, a procedure which consisted of making a small incision in the groin of Mrs. Thompson and inserting catheters in the femoral artery and the saphenous vein; Earl Schultz, M. D., a Fellow in Anesthesiology, was to operate certain machines after the cross-circulation between the donor and the patient had been established. Thus, defendants Drs. Lillehei, Varco and Buckley, the anesthesiologist, were stationed at the table of Leslie Ann and were directing their efforts entirely to the op-

erative procedures upon her. Defendant Dr. Warden, together with Drs. Uri and Cohen were concerned with Mrs. Thompson, and performing the operative procedures and other functions above mentioned. In addition to these persons, it appears there were various internes and nurses stationed about the area, there being 15 to 20 persons in the operating room on that morning.

About an hour after Mrs. Thompson had been brought into the operating room, with her table being placed about six feet from the table occupied by Leslie Ann, an unusual incident occurred. At this time the cannulations on Mrs. Thompson had been completed but the cross-circulation hook-up had not been established. Dr. Uri, the anesthesiologist at Mrs. Thompson's table, stated rather loudly that he could not get the blood pressure and pulse of Mrs. Thompson, the donor; immediately Dr. Warden removed the stopper from the catheter which had already been inserted in the femoral artery and observed that the blood was deeply cyanotic. Immediate steps were taken to restore the blood pressure and pulse of Mrs. Thompson, and in a short time this was accomplished. Because of this incident, cross-circulation between Mrs. Thompson and Leslie Ann was not effected and the operation on Leslie Ann was abandoned. It was subsequently determined that Mrs. Thompson sustained a brain lesion which caused a partial paralysis of her body and other injuries, all of which are serious, permanent and partially disabling. Other pertinent facts will be discussed in disposing of the contentions before us.

From the inception of this litigation plaintiffs' position has been that the brain lesion sustained by Mrs. Thompson was produced by and resulted from an air embolism, which the defendants negligently permitted to enter Mrs. Thompson's circulatory system. Thus, in Mrs.

2. Drs. Lillehei and Varco, both surgeons, were regarded as expert in this field of surgery. They and the other two defendants pioneered open heart cross circulation surgery.

Thompson's complaint it was first charged:

"that the defendants so negligently, carelessly and unskillfully connected plaintiff's blood circulatory system with that of said Leslie Ann Thompson that air was permitted to enter plaintiff's blood stream through an intravenous drip inserted in plaintiff's arm by defendants in performing said operation with the consequence that it found its way to plaintiff's brain and there inflicted the damages hereinafter alleged."

When the case came on for trial, plaintiffs' counsel took a different approach as to the manner in which air entered Mrs. Thompson's system. In his opening statement counsel stated:

"Before the hookup was actually completed, and after the daughter had been prepared for it and the mother partially prepared for it, air was injected into it, forcibly injected into the mother's blood stream which went up past the heart and into her brain and caused a brain injury * * *. The evidence will show that this air was forcibly injected into the mother carelessly and negligently and that's the basis for our claim of negligence here."

Before getting into the crux of the case, negligence, we shall dispose of conflicting contentions regarding the cause of Mrs. Thompson's present unfortunate condition. Whereas plaintiffs attribute her brain injury to an air embolism, defendants stoutly urge that it was impossible for air to pass through the tiny capillaries in the lungs and into the brain. On this issue, plaintiffs must prevail. Colonel Thompson testified that during an interview with Dr. Lillehei prior to the contemplated operation he inquired as to the attending risk to the donor and was informed by Dr. Lillehei—

"There is no risk, * * * I will correct that. I can't say there is no risk. There is some risk to her, but we feel we have taken the proper precautions to guard against this. We feel that the risk involves the probability of air getting into the circulating system. To guard against this we have a doctor with a flashlight and a clamp protecting both the patient and the donor. If air is seen in this tube by means of this light, this doctor is to clamp this tube to prevent the air from entering the body."

Colonel Thompson testified to a conversation with Dr. Lillehei on the morning of the occurrence:

"Dr. Lillehei said, 'I have bad news for you, but it's not as bad as it could have been.' Dr. Lillehei explained that something went wrong during the operation. * * * Dr. Lillehei said, 'Because of apparent air in an I.V. Geraldine's pulse and blood pressure were immeasurable and this was the reason they stopped.'"

On the following day, October 6, 1954, according to Colonel Thompson, Dr. Lillehei again stated, "* * * [her] condition was apparently the result of an air embolism, * * *."

On March 28, 1955, nearly six months after the incident, Dr. Lillehei wrote a letter to Colonel Thompson, in which he stated: "As you are aware, Geraldine suffered air embolism October 5, 1954 and has been hospitalized continuously in the University Hospitals since that time. * * *."[3]

Dr. Earl Schultz, originally a defendant, testified concerning Mrs. Thompson: "She was in distress. * * * She was in a state of shock. * * * I made a working or provisional diagnosis of air embolism." Additionally, plaintiffs' medical expert stated that air embolism can cause the type of brain lesion suffered by Mrs. Thompson.

 The foregoing evidence speaks for itself. Elaboration thereon is unnec-

3. While it was not formally offered into evidence, Dr. Lillehei admitted writing this letter.

essary. We deem it of sufficient probative value to present a jury issue as to whether an air embolism was the producing cause of the injury to Mrs. Thompson's brain.

■ We now reach the question of whether there was probative evidence of negligence which caused Mrs. Thompson to suffer an air embolism. As applied to physicians and surgeons in malpractice cases, the usual standards of ordinary care are modified to some extent in recognition of the fact that the practice of medicine is a special art. Thus, under Minnesota law, a physician or surgeon is not an insurer; "[h]e is only required to possess the skill and learning possessed by the average member of his school of the profession in good standing in his locality, and to apply that skill and learning with due care." Yates v. Gamble, 198 Minn. 7, 268 N.W. 670, 673; Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639, 644, 57 A.L.R.2d 364. Ordinarily, because of the technical and specialized subject matter, expert medical testimony is required to establish failure to use such due care under the circumstances. See Yates v. Gamble, supra, 268 N.W. at page 673; Quickstad v. Tavenner, 196 Minn. 125, 264 N.W. 436, 437. Furthermore, in Minnesota, the doctrine of res ipsa loquitur is not available to plaintiffs in making proof of alleged negligence in malpractice cases. This was recognized more than fifty years ago in the case of Staloch v. Holm, 100 Minn. 276, 111 N.W. 264, 269, 9 L.R.A.,N.S., 712, where the pronouncement was made in this language:

"The fact that the patient died immediately after the operation is in the view here taken not significant. In Haire v. Reese, 7 Phila. (Pa.) [138] Judge Thayer said: 'No presumption of the absence of proper skill and attention arises from the mere fact that the patient does not recover. * * * God forbid that the law should apply a rule so rigorous and unjust as that to the relations and responsibilities arising out of this noble and humane profession.' In Ewing v. Goode, C.C., 78 F. 442, Judge (now Secretary) Taft said: 'A physician is not a warrantor of cures. If the maxim res ipsa loquitur were applicable, * * * and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art; for they would have to assume financial liability for nearly all the "ills that flesh is heir to."' If apart from the fact of death, there is no liability—and that is the conclusion in this case—that fact does not create it."

The Supreme Court of Minnesota adhered to this principle in Yates v. Gamble, 198 Minn. 7, 268 N.W. 670, at page 674, where it is said: "No presumption of negligence arises from the fact that an operation or treatment by a surgeon or physician does not result in a cure. (Citing cases.) * * * The doctrine of res ipsa loquitur does not apply in a case of the kind here presented. (Citing cases.) On the contrary, our decisions hold that in such a case the opinion evidence of medical experts is necessary (Cases cited)." See also Simon v. Larson, 210 Minn. 317, 298 N.W. 33, 34; Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N.W.2d 426, 429.

Thus, we must bear in mind throughout, that the fact that Mrs. Thompson suffered an air embolism does not in itself establish the fact of negligence.

■ Like the trial judge, we have no difficulty in arriving at the conclusion that there was a total failure of proof of actual negligence on the part of any of the four defendants. As we have seen, Drs. Lillehei and Varco were stationed at the table of Leslie Ann from about 7:45 a. m. until the eventful occurrence to Mrs. Thompson approximately three hours later. As far as this record is concerned, they did not even see or examine Mrs. Thompson at any time on the morning of the contemplated operation. These surgeons were concerned solely with Leslie Ann and devoted their skill

in preparing her for the heart surgery. Furthermore, it appears that Dr. Lillehei stood with his back to the donor's table and because of the lighting, surgical drapes, equipment, etc., it was impossible for those at Leslie Ann's table to observe the procedure at Mrs. Thompson's table. Dr. Buckley, the anesthesiologist for Leslie Ann, was required to and did remain constantly at the head of her table. There was no showing that this defendant played any part whatsoever in preparing Mrs. Thompson for the cross-circulation procedure. Dr. Warden was one of the surgeons at the donor's table. He assisted in the cannulation, but again, there is not a scintilla of evidence that he performed his duties in an unskillful or negligent manner, or that any act performed by him caused or contributed to plaintiff's injury.

 Also urged upon us is the contention that aside from these four defendants, someone in the *operating room* was guilty of negligence, and that under the doctrine of respondeat superior, the defendants and particulary Dr. Lillehei, are vicariously liable. More precisely, plaintiffs insist that there was evidence from which a jury could find that Dr. Lillehei was the surgeon in charge, and that he exercised supervision over those participating in the operative procedures, or should have done so. Consequently, it is said he must stand responsible for the negligent conduct of those under his supervision. To substantiate this theory our attention is directed to the fact that Colonel Thompson made all preliminary arrangements with Dr. Lillehei; and that this doctor gave assurance that proper precautions would be taken to guard Mrs. Thompson against air embolism during the cross-circulation procedure.

The trial court disposed of this contention by demonstrating clearly and convincingly that, under the facts, Dr. Lillehei was not the "surgeon in charge" or "captain of the ship," that is, there was no showing that Dr. Lillehei appointed or employed any of the participating doctors or anesthesiologists, or that he had supervision or control over Dr. Uri or others at Mrs. Thompson's table, or that he had knowledge of any negligent act of others. Upon this factual premise, Judge Devitt demonstrated that there was no legal basis for application of the doctrine of respondeat superior. See pages 720, 721, 722 of 164 F.Supp. We adopt the reasoning of the trial judge, and concur in his legal conclusions.[4]

 Primarily, of course, neither Dr. Lillehei nor any of the other defendants could be liable vicariously unless it was shown that the air embolism was proximately caused through some act of negligence. Our careful and considered analysis of the record convinces us that this showing was not made. As we view the situation, we have evidence from which a jury could reasonably and permissibly find (1) that an air embolism

---

4. Minnesota courts have recognized that there may be a division of duties and responsibilities among doctors. Thus in Brossard v. Koop, 200 Minn. 410, 274 N.W. 241, it was held that an anesthesiologist, occupied with his own specialty, was not liable for the negligence of the surgeon. In Moeller v. Hauser, 237 Minn. 368, 54 N.W.2d 639, 57 A.L.R. 2d 364, recognition and discussion was had of the division of duties and authority among various staff members of the hospital in affixing liability upon the responsible persons. See also, Nelson v. Sandell, 202 Iowa 109, 209 N.W. 440, 46 A.L.R. 1447 (anesthesiologist not liable for dentist's negligence) ; Runyan v. Goodrum, 147 Ark. 481, 228 S.W. 397, 13 A.L.R. 1403 (absent negligence in selecting trained technician, doctors not responsible for negligence of X-ray technician); Morey v. Thybo, 7 Cir., 199 F. 760, 42 L.R.A.,N.S., 785 (anesthesiologist not liable for negligence of surgeon) ; Huber v. Protestant Deaconess Hospital Ass'n, 127 Ind.App. 565, 133 N.E.2d 864, and Woodson v. Huey, Okl., 261 P.2d 199 (surgeon not liable for wrongful act of anesthesiologist) ; Dill v. Scuka, D.C.Pa., 175 F.Supp. 26.

The case of St. Paul-Mercury Indemnity Co. v. St. Joseph's Hospital, 212 Minn. 558, 4 N.W.2d 637, relied upon by plaintiffs, is clearly distinguishable upon the facts.

caused the brain damage; (2) that it is not good medical practice to permit air to enter the circulatory system; and (3) that one of the bottles attached to Mrs. Thompson became empty. Proof of these three elements falls far short of proving a breach of the standards of care owed by physicians and surgeons. There may be situations where expert evidence is not necessary to make out a jury issue on the question of negligence, Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1, and see Brossard v. Koop, 200 Minn. 410, 274 N.W. 241, but, as stated by the annotator in 141 A.L.R. 5, at page 6, "The overwhelming weight of authority supports the view that, ordinarily at least, expert evidence is essential to support an action for malpractice against a physician or surgeon." Minnesota follows this general rule. See Yates v. Gamble, 198 Minn. 7, 268 N.W. 670, 673; Quickstad v. Tavenner, 196 Minn. 125, 264 N.W. 436, 437; Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N.W.2d 426, 429; Thorkildson v. Nicholson, 154 Minn. 106, 191 N.W. 269, 270; Berkholz v. Benepe, 153 Minn. 335, 190 N.W. 800.

From a review of the record, it is clear that plaintiffs failed to establish by probative evidence that any of the instant participators or any other person present in the operating room failed to exercise the duty of due care imposed upon them. Although plaintiffs made a feeble attempt to establish that the I.V. set-ups themselves were defective in some manner, in this they were wholly unsuccessful; there was not a shred of evidence that air was forced into Mrs. Thompson's blood stream by any means; there was no expert evidence showing or from which it could be inferred that an empty I.V. bottle would necessarily or even possibly result in an air embolism. In short, there was no evidence that it was negligent to permit an I.V. bottle to run dry, or that such alleged negligence caused the air embolism.[5]

In this regard, our factual situation is very like that in Simon v. Larson, 210 Minn. 317, 298 N.W. 33, where plaintiff failed to show by probative expert testimony that mere contact with the chemical involved was dangerous, or that, under the facts, it was likely to cause the injury suffered. See also, Collings v. Northwestern Hospital, 202 Minn. 139, 277 N.W. 910, 912; Wallstedt v. Swedish Hospital, 220 Minn. 274, 19 N.W.2d 426; Johnson v. Arndt, 186 Minn. 253, 243 N.W. 67, 69; Moses v. St. Barnabas Hospital, 130 Minn. 1, 153 N.W. 128; Yates v. Gamble, 198 Minn. 7, 268 N.W. 670, 674, and Dill v. Scuka, D.C.Pa., 175 F. Supp. 26, where plaintiffs, with proof of the negligent act amounting to no more than speculation or conjecture, failed to establish the proximate cause of injury.

Although plaintiffs here concede that the doctrine of res ipsa loquitur does not apply, and strongly urge that their evidence establishes negligence, it is clear that in fact the claim of negligence here, by reasoning from effect to cause, rests upon this doctrine. As in the cases cited supra, plaintiffs' evidence amounts to no more than conjecture or possible explanation for Mrs. Thompson's present condition.

Plaintiffs make one further point. By stressing the pre-operative conversation between Colonel Thompson and Dr. Lillehei, plaintiffs seemingly wish to rely on an alternate theory of breach of warranty, i. e., that Dr. Lillehei warranted that all would be well during the operation, and that therefore, he should be liable for its unfortunate outcome. We need not dwell on such an implausible theory. Suffice it to say that the complaint sounded in tort; that physicians are not insurers of results; and that plaintiffs' recovery must depend upon a finding of actual negligence.

An attempt is also made by plaintiffs to present points relating to evidentiary matters.

5. Plaintiffs failed to question Dr. Jeub, their expert, on this matter. Defendants' expert witness categorically denied that it was dangerous to let an I.V. run dry.

■ After plaintiffs' counsel had completed examination of Dr. Lillehei as an adverse witness under Rule 43(b), Federal Rules of Civil Procedure, and in the trial judge's chambers, he offered in evidence "University Hospital records. The offer is made under 28 U.S.C.A. § 695" (obviously counsel meant § 1732).

"The Court: Business records?

"Mr. Peterson: Business records, yes."

Certain objections were made and colloquy between the court and counsel ensued, resulting in an observation by the court to the effect that the record in its entirety might contain documents wholly irrelevant to the issues in litigation. To avoid objectionable matter, the court ruled that counsel should offer such portions of the record that were deemed relevant. This ruling seemed to satisfy all attorneys, at least counsel for plaintiffs acquiesced therein by thereafter offering certain documents and papers constituting a part of the whole record. Now plaintiffs assign as prejudicial error the exclusion of the hospital record in the aggregate.

We note at the outset that the proper foundation was not laid for admission of the documents as business records. Section 1732, Title 28, U.S.C.A., provides that " * * * any writing or record * * * shall be admissible as evidence * * * *if made in the regular course of any business* * * *.*" (Emphasis supplied.) No such showing was made, and while counsel representing defendants stated they had no objections to certain portions of the record, they did oppose introduction of the record in its entirety because of lack of foundation.

■ Aside from the failure of plaintiffs to meet the plain requirements of the statute with respect to proper foundation, the record does not establish that prejudicial error resulted from the court's ruling now complained of. Plaintiffs complain specifically of the exclusion of page 1 of the hospital record (showing diagnosis to be air embolism); page 2 of same (showing Mrs. Thompson to be of good health prior to the operation); page 19 of the hospital record (a letter from a certain Dr. Gullickson, not a witness, referring Mrs. Thompson to a Dr. Grobman in Texas, reviewing her history, with diagnosis of air embolism); plaintiffs' exhibit No. 15, being page 16 of the hospital record (letter written by Dr. Lillehei to Mr. Thompson, containing the statement of diagnosis as being air embolism. This letter was not offered in evidence, inasmuch as Dr. Lillehei admitted writing it). Plaintiffs also complain of the exclusion of exhibits 10 and 11, being papers read before professional societies (not offered for the purpose of impeachment, excluded as hearsay). Careful scrutiny of the foregoing exhibits, in the light of our previous discussion, satisfies us that they contain no information which would have assisted plaintiffs in creating a jury issue on the questions of defendants' malpractice resulting from their actual negligence, or their liability under the respondeat superior doctrine.

Complaint is also made of limitations upon plaintiffs' examination of defendants under Rule 43(b), Federal Rules of Civil Procedure. We have made a painstaking examination of the maze of objections and rulings thereon, which are replete throughout the record, to determine whether the court unduly restricted plaintiffs in their cross-examination of defendants as adverse parties, or excluded any competent and relevant evidence which would tend to supply the missing elements essential to the creation of a jury question. We find nothing to warrant us in disturbing the rulings of the trial court.

■ With respect to this matter, we observe that counsel for plaintiffs propounded many questions which sought to elicit the opinions of defendants as expert witnesses. Objections to this line of questioning were sustained, although the court permitted wide latitude in the examination for facts. Plaintiffs' position seems to be that their right to cross-examine the defendants as adverse parties encompassed a search for favora-

ble expert opinions and conclusions. Defendants assert that the rule was designed to permit a party to get into evidence *facts* which are within the knowledge of the adverse party, but does not contemplate a search for opinion evidence. They rely on decisions applying similar state statutes which so hold,[6] and upon federal cases holding that a party may not, by the use of discovery depositions or interrogatories, require opinions from the adverse party.[7] While we are impressed with the argument advanced by defendants, we refrain from ruling this point. This for the reason that plaintiffs have failed to demonstrate that they were prejudiced by the court's rulings which prevented them from engaging in a search for expert opinions. In not a single instance did plaintiffs' counsel undertake, by offer of proof, to disclose or indicate what the defendants' opinions would have been. This is not a situation of such certainty as to what the defendants would have testified to, that the making of an offer of proof could be regarded as a mere futility. See Hawkins v. Missouri Pac. R. Co., 8 Cir., 188 F.2d 348, 350. We are mindful that where, as here, an adverse party is being cross-examined, the examiner may, through lack of knowledge, find it difficult to accurately reveal, by offer of proof, the answers which he expects to elicit from the witness, but, as stated by the court in Peckham v. United States, 93 U.S.App.D.C. 136, 210 F.2d 693, at page 702, "The [district] court was mistaken in basing his rejections [of proffers] upon the theory that during the cross-examination of an adverse witness proffers are never in order. * * * but neither is a proffer invariably inappropriate when the examination is cross and objection to a question is sustained. There is a discretion * * *." Sound logic dictates that we should not be called upon to condemn the actions of the trial court in excluding evidence when its competency, materiality, or relevancy is not affirmatively demonstrated.

The complex problems afforded by this hard-fought litigation were patiently, carefully and fairly met and considered by the trial judge. Although our sympathies extend to plaintiffs, it is clear that no submissible case was made on the question of negligence; we are satisfied that no prejudicial errors were made in rulings upon evidence. The judgments of the trial court are

Affirmed.

---

6. E. g. Bylund v. Carroll, 203 Minn. 484, 281 N.W. 873, 875.

7. E. g. Beirne v. Fitch Sanitarium, Inc., D.C.S.D.N.Y., 20 F.R.D. 93; Olsen v. St. Anthony Machine Products Co., D.C. Minn., 18 F.R.D. 313.