374 P.2d 425 (1962)
In the Matter of the ESTATE of Mary J. DRAPER, Deceased.
Etta PENCE, Blanche M. Davis, Sylvia Smith and Anna Peterson, Appellants (Contestants below),
v.
Fred LUSH, Executor of the Estate of Mary J. Draper, Deceased, Appellee (Proponent below).
No. 3061
Supreme Court of Wyoming.
September 12, 1962.
James A. Greenwood, Cheyenne, and John E. Stanfield, Laramie, for appellants.
Henderson, Godfrey & Kline, Harry B. Henderson, David D. Uchner, Cheyenne, for appellee.
Before BLUME, C.J., and PARKER, HARNSBERGER, and McINTYRE, JJ.
Mr. Justice PARKER delivered the opinion of the court.
The four sisters of Mary J. Draper, deceased, sought to revoke her February 7, *426 1958, will on the grounds that she did not have testamentary capacity; that the alleged will was not executed as required by law or sufficiently proved to be her last will; and that at the time of the signing, she was acting under restraint, duress, menace, fraud, undue influence, and fraudulent misrepresentations  all occasioned by Fred Lush, the executor, who was named as a specific devisee and residuary legatee. The inventory and appraisement totaled some $67,000 and specific bequests other than that to Lush of $5,000 totaled $6,000.
There was a trial to a jury which failed to agree. Thereafter, the case was assigned to a judge from outside the district for a second jury trial at which time it was conceded that the 1958 will was executed according to law and that testatrix had testamentary capacity.
Proponent moved for a directed verdict at the close of contestants' testimony and again at the conclusion of the evidence, both of which motions were overruled. This jury also failed to agree, and within ten days proponent moved for judgment in accordance with his previous motions for directed verdict. The court granted the motion, adjudging the will to be valid. Contestants then charged a mistrial because of various irregularities and moved for new trial, but the motions were overruled, and the cause appealed. It is not here necessary to discuss certain of the charges of error: those concerning mistrial are not argued and those relating to instructions, refusal to submit special verdicts, and like matters become academic regardless of the outcome of the appeal since a reversal of the judgment would permit a new trial and an affirmance would indicate that there was no evidence to warrant a verdict for contestants, regardless of procedures.
Contestants draw attention to the provisions of § 1-130, W.S. 1957:
"When the jury is discharged after the cause is submitted or during the trial, the cause may be tried again immediately or at a future time, as the court may direct."
They insist that under this statute the court was without power to take any action other than to grant a new trial, citing Jones v. Chicago, B. & Q.R. Co., 23 Wyo. 148, 147 P. 508, and Pike & Richardson v. City of Sheridan, 22 Wyo. 312, 139 P. 912. They fail however to note the reason for the decisions in those cases which is apparent from the statement, 147 P. at 516:
"* * * And there is no provision in the statute permitting the court to retain control of the proceedings of the trial after so discharging the jury, for the purpose of a further consideration of the questions of law presented by the evidence. * * *" (Emphasis supplied.)
Rule 50(b), Wyoming Rules of Civil Procedure, permits the court to retain control after the discharge of the jury. The pertinent sentence reads:
"Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the moving party may move not later than 10 days after the entry of judgment to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict. * * *"
See Guerrero v. American-Hawaiian Steamship Company, 9 Cir., 222 F.2d 238; Thompson v. Lillehei, D.Minn., 164 F. Supp. 716 (affirmed 8 Cir., 273 F.2d 376); Olszewski v. United Fruit Co., E.D.Pa., 34 F. Supp. 113; Howard v. United States, E.D.Tenn., 1 F.R.D. 361; Davis v. Riggle, Fla.App., 105 So.2d 600; Annotations, 69 A.L.R.2d 449, 466, 31 A.L.R.2d 885, 891; 2B Barron and Holtzoff, Federal Practice and Procedure, § 1078 (1961); 5 Moore, Federal Practice, § 50.10 (2 ed.); and 14 Nichols, Cyclopedia of Federal Procedure, § 68.82 (3 ed.).
*427 Rule 87, Wyoming Rules of Civil Procedure, provides that laws in conflict with the rules shall be of no further force and effect, and § 1-130 insofar as it conflicts with Rule 50(b) gives way to the rule so that a single issue remains, which the proponent states as follows:
"* * * The motion presents only a question of law as to whether or not, when all of the evidence with reasonable inferences therefrom, is considered in its aspect most favorable to the contestants, there is a total failure or lack of evidence to prove any necessary elements of their case. Willits v. Yellow Cab Company [7 Cir.], 214 F.2d 612. * * *"
We review then the evidence in the light of the law applicable to undue influence and fraud (the other charges against the will were ignored in the argument before this court).
In that connection we note contestants' argument that the testimony of proponent be disregarded on the purported authority of Hawkey v. Williams, 72 Wyo. 20, 261 P.2d 48. We think that counsel misconstrue the holding of that case for the rule is clear that in passing on a motion for directed verdict presented at the conclusion of all of the evidence the court should look for circumstances making out a case of the adverse party including the whole testimony in the case and not only that offered by the party against whom the motion is made. Savage v. Town of Lander, 77 Wyo. 157, 309 P.2d 152; In re Lane's Estate, 50 Wyo. 119, 58 P.2d 415, 60 P.2d 360. There is no reason why this rule should not apply in the consideration of the motion before us. Of course, in the matter at hand we must bear in mind the statement of In re Lane's Estate, supra, 60 P.2d at 363:
"It is true that all evidence favorable to the party adverse to the motion must be regarded by the court in the disposition thereof and also all reasonable inferences which may be deduced therefrom. But the inferences must be reasonable and legitimate. They cannot be strained or the result of mere conjecture or surmise. * * *"
Mrs. Draper was a childless widow over eighty years of age at the time of her death on August 25, 1958. Her husband had died of cancer in 1950, and she had continued to live on their farm near Albin. In 1952 she broke her hip while in California and was hospitalized there for some time. She suffered from dropsy, her legs were swollen, and as a result she customarily carried a cane and walked with some difficulty. Her vision was not good, and she used a magnifying glass to read but took newspapers and magazines, apparently read them and looked at television. Dr. Robert B. Stump, opthalmologist, the only professional witness who discussed her vision, stated that when he examined her on January 21, 1957, she could read .75M print (smaller than that used in ordinary newspapers), but read practically only with her right eye and had some eye and general fatigue on reading. He said an obtainable improvement in her vision was insufficient to warrant any steps to be taken by him; that her vision would be expected to deteriorate thereafter, but he did not think that she would have lost substantial amounts of vision before February 7, 1958.
Fred Lush, who with his wife and three children lived on a farm approximately five miles away, although unrelated to Mrs. Draper, was the executor and principal beneficiary. He had known the Drapers all his life, and with his father had visited testatrix's husband during his illness. Before that he had done some work on the Drapers' telephone. When she called him and asked that he help with her husband's funeral arrangements, he did so, and thereafter assisted her in various ways, he and his wife visiting testatrix often, twice a week or more, and helping with the repair of the property, doing chores, and taking her back and forth to town since she was not able to drive her automobile. On these trips she usually saw the beauty operator, her physician, and the pharmacist. Lush talked with her about business matters and *428 on occasion kept her business papers (certificates of deposit and her will) in his own safe deposit box to which she had no key. She told him about various matters which he kept in confidence and conceded that to such an extent he was a confidant.
The record discloses that this relationship was about the same over the years except for the time that she was in California with the broken hip. In 1954 Mrs. Draper executed a will drafted by Ray Lee, a Cheyenne attorney. Lush brought her to town at that time and left her at the lawyer's office but did not then know about the will's being drawn. The 1954 will was introduced in evidence along with the one dated February 7, 1958, here challenged. The two instruments are remarkably similar, revoking former wills and codicils, directing the executor to pay expenses of last illness and funeral and providing for details about testatrix's burial. Both gave Fred Lush $5,000; his wife $1,000; Mary Lou Pence, a niece, $1,000; a sister, Anna Peterson, $1,000; a sister-in-law, Nannie Repp, $1,000. The 1954 will devised $1,000 to testatrix's sister-in-law, Ruth Wiles; $2,000 to James Besak, a nephew; and gave some of her personal effects to Mrs. Lush  these latter provisions were not contained in the 1958 will but there was a new bequest in the amount of $2,000 to James A. Ward, who previously lived with the Drapers for some years.
Details of the occurrences prior to the execution of the 1958 will are provided only by Lush's testimony. In January 1958 Mrs. Draper discussed with him certain changes which she wished to make in the 1954 will. She had discovered that Ray Lee had moved from Cheyenne. Lush went through the telephone book and Mrs. Draper selected James Hunter, a Cheyenne attorney, whose father she had known. On a day she was in town for an appointment with her doctor, Lush took testatrix to Hunter's office and she discussed the matter with the lawyer, Lush being in the same room but not with them. The lawyer did not have a stenographer and drew the will later, mailing it to Mrs. Draper. She showed it to Lush and they discussed it. He said he read it to her twice. On February 7 he again brought her to Cheyenne for an appointment with her physician, Dr. K.L. McShane, but did not go to the office. She executed the will before the doctor and two nurses, all three signing as witnesses. Later she in company with Lush attempted to record the will with the Laramie County Clerk of Court but was refused. At her request, the will was placed in Lush's safe deposit box in Cheyenne where it remained for some time before it was taken to her own at Burns.
According to the undisputed evidence in the record, Mrs. Draper was a friendly person with an active mind who was often visited by various of her friends and relatives. She elected to remain on the farm which was being rented by a neighbor despite the advise of her sisters that she should move to a more convenient location. However, she did modernize the house as to plumbing and it was served by REA electricity. She was entirely dependent on friends and relatives for transportation. She was able to do her own cooking but had assistance in taking care of the house.
The recounting of occurrences with Mrs. Draper and the descriptions of her condition were varied. Certain of this testimony would undoubtedly have been subject to objection on the ground that opinions rather than facts were stated or that the time and place were lacking, but it was unchallenged.
Marvin Anderson, who had known the Drapers for many years and who had commenced operation of their farm before Mr. Draper's death, said that she asked him many questions about wheat and its selling prices; that she was dependent on others; that she had difficulty in reading; that he quite often helped her with business matters in the last five or six years of her life; when asked about neighborliness, he said, "Someone like Mary you always stopped to look."
*429 Harold Pence, a nephew who lived near the Draper property, said he advised her not to sell some farm property at a certain price and that he had once helped her with her income tax. He said, "she couldn't see hardly at all * * * she didn't even try to read a newspaper."
Pearl Davis, a neighbor, said Mrs. Draper had had letters which she could not read, that she had read them to her. She said she usually stopped to see Mrs. Draper when she went by although that once in awhile when she saw Lush's pickup she drove on by. She said Mary had to use a magnifying glass to read.
Mrs. E.L. Zimmerman, who lived in the neighborhood, said Mrs. Draper watched TV and could tell the people by the voices more than the persons; that she could not read except with the aid of the magnifying glass and that "she had to read so slowly and she couldn't get the understanding and she understood it much better if somebody would read it to her." She said it was hard for Mrs. Draper to get her breath and she was feeble but that she was normal.
Anna Peterson, a sister who lived in California, had not seen Mrs. Draper since August of 1956, but said the will didn't "sound like Mary."
Sylvia Smith, another sister living in California, said there was never any misunderstanding between the sisters except "that that happens in all families." She told of incidents disclosing Mrs. Draper's forgetfulness.
Zel Pence, a neighboring farmer, said that Mrs. Draper was dependent upon other people. He said in the last few years of her life when he would pay her for pasture rental, "She would hold the check in her hand and maybe this ain't right and maybe she'd think this ain't right."
James Ward, who had lived with the Drapers as a boy, said that he and his family had not visited Mrs. Draper as often in recent years and that he supposed "part of it was due to my illness and it seemed like things changed and she didn't seem to need our assistance as much as she had before."
Teressa Olson, a neighbor, said she was present when some people went by Mrs. Draper's house and that Mrs. Draper had said, "It looks like Marvin Anderson and Norma Jean is with him," which she believed was correct.
Walter Brantley, a neighbor, said he had seen her reading a newspaper and watching television and she would have some article in the paper that she would want him to read and would show him; that this had occurred up until a week or so before she went to the hospital for the last time.
Doris Ecklund, a neighbor, said she didn't notice any change in Mrs. Draper's appearance or condition except she was getting a little older as everyone did.
James B. Johnson, a Cheyenne pharmacist, said Mrs. Draper often came in to have her prescriptions filled or refilled, that he wrote checks for her and she signed them, that she would look to see if he had each of her bottles and if they were filled with the proper tablets and check her bill to see if it were proper.
John Bunton, another Cheyenne pharmacist, said she usually came back and watched him fill the prescriptions. She was very particular about the bottles and labeling, "several times we'd have the bottles, hers, and we'd be filling somebody else's and she would think we were filling hers and she announced that it was the wrong pills and it wasn't hers."
The Reverend John Patterson said he had talked to her as a minister some eight or ten weeks before her death about her funeral arrangements and services. He said she had many questions about religion and about death; that she had many convictions and was definite about them. At the end of her life, he thought physically her condition "might have shown a little different but the mental condition didn't seem to."
Willis A. Catallier, a podiatrist who treated her, said she was very alert.
*430 Dr. McShane said she was intelligent and mentally alert up to the time of her death.
Laura Wiedeburg, the nurse who prepared Mrs. Draper for Dr. McShane's treatment, said that she was very alert and very active up to the time of her death and that there was no particular change except that she was getting a little older and a little more feeble.
John Reed, an employee in the collection department of the American National Bank, said that Mrs. Draper was "kind, stern in appearance but she was usually friendly and she knew exactly what she was doing when she was in the bank."
As to the alleged error of the trial court in entering judgment, contestants first argue that undue influence is seldom susceptible of direct proof and may be established by facts from which it may be fairly and reasonably inferred, citing In re Conroy's Estate, 29 Wyo. 62, 211 P. 96. Proponent concedes that one contesting a will must necessarily rely largely on circumstantial evidence, insisting only that a strict standard is required when direct evidence is not available.
Counsel seriously urge that in "determining whether or not she [testatrix] was susceptible to undue influence or fraud on this account [her vision], the sole issue is whether she read her will. * * * It is entirely irrelevant as to whether she could read anything else  if she did not read her will, she was susceptible to undue influence and fraud." No supporting authorities are presented on this point, and the conclusion is unwarranted.
"If the will has been read to testator before execution, under circumstances which give him a fair opportunity of learning its contents, it will be presumed that he is acquainted with and approves its contents * * *." 1 Bowe-Parker: Page, Wills, p. 179 (1960).
And see 94 C.J.S. Wills §§ 130, 178; 57 Am.Jur. Wills § 863.
Contestants place great reliance upon In re Nelson's Estate, 72 Wyo. 444, 266 P.2d 238, urging that it is authority for the "inference" or "shifting burden" rule. They argue that the facts in the case at bar clearly raised an inference or presumption of undue influence and that the jury as a finder of fact was the only instrumentality which could determine whether or not such burden was met.
The Nelson opinion was a comprehensive and careful analysis of various questions raised in the contest of a will on the grounds of undue influence. We cannot agree however that contestants have correctly applied the rules therein expressed to the facts of this case. Several pronouncements in the opinion are significant in determining the matter now before us. Mr. Chief Justice Blume there discussed so-called unnatural wills and among other things pointed out that next of kin and relatives no matter how near they may be cannot be said to have any natural right to the estate of the testator which could be asserted against his legally executed will, citing several specific illustrations. It was there stated that the mere existence of confidential relation between testator and a beneficiary under the will raises no presumption that the beneficiary exercised undue influence over the testator; that such relationship was ineffective for the mentioned purpose unless it was dominant, and that the "inference" or "shifting burden" rule had no application unless in addition to such relationship there existed suspicious circumstances such as the beneficiary taking part in the preparation or procuring of the will or actually drafting or assisting in its execution or that the testator was weakminded, in frail health, and particularly susceptible to influence or that the provisions of the will were unnatural and unjust. The case of In re Llewellyn's Estate, 83 Cal. App.2d 534, 189 P.2d 822, 191 P.2d 419, was quoted with approval, 266 P.2d at 252, wherein it was said that before the proponent of the will has any obligation to present evidence showing that undue influence *431 did not exist there must be evidence, the probative force of which establishes that (1) the relations between the one charged with exercising undue influence and the decedent afforded an opportunity to control the testamentary act, (2) the decedent's condition was such as to permit subversion of his freedom of will, (3) there was activity on the part of the person charged with exercising undue influence; and (4) that such person unduly profited as beneficiary under the will.
In applying these rules of the Nelson case to the matter now before us, we bear in mind other principles which we have announced with some frequency.
"`Clear proof of such influence is required in order that a solemnly executed testament may be set aside for undue influence. * * *'" In re Anderson's Estate, 71 Wyo. 238, 255 P.2d 983, 986.
"* * * Wills deliberately made by persons of sound mind are not to be lightly set aside, and the undue influence which will warrant doing so must be proven to be such as destroys the free agency and thereby substitutes the will of another for that of the testator. * * *" Cook v. Bolduc, 24 Wyo. 281, 157 P. 580, 581, 582, 158 P. 266.
Reviewing the record and giving the evidence every inference favorable to the contestants, we do not find any proof of undue influence in accordance with the criteria set out in the Llewellyn case and approved by this court.
As to each requirement, counsel has assumed facts which are not in evidence. For instance, it is said, "There can be no question but that a confidential relationship existed between Mary Draper and Lush. * * An elderly woman is not going to entrust a young man who is not even related to her with the possession of $10,000.00 in certificates of deposit unless she trusts and has confidence in that individual." Actually, the proof went only to a friendship between the two, frequent visits by Lush and his wife with Mrs. Draper, the performing of certain tasks for her by them, the furnishing of her with transportation to and from neighboring towns, the keeping of certain of her papers in his safe deposit box, and discussion with her which Lush did not reveal to other persons. No authority is presented to show that this constitutes a confidential relationship within the meaning of discussions concerning undue influence in the execution of wills.
Contestants argue that Lush was inclined to take advantage of his visits and position in testatrix's life, and give as an illustration the testimony of Mrs. Davis who said that in January or February of 1959 Lush had told her he would see Etta Pence "in H before she would get any of Mary's money." Such a remark, for whatever reason made, was unseemly and censurable, but that fact does not necessarily imply prior improper motive.
It is urged that "The record clearly shows that Lush was deeply involved in the preparation and execution of the 1958 will." The evidence does not bear out such assumption. It shows instead that she called him and asked him to come down and he discussed it with her, that she chose a lawyer when he read names from the telephone book, that he took her to the lawyer's office and sat in the same room but not with her and the lawyer during the time they discussed it; that the lawyer mailed the will back to her; and that Lush thereafter read it to her, then took her to the doctor's office where, when he was not present, she executed it before the doctor and two nurses. This falls far short of the interpretation placed on the circumstances by counsel.
Again, it is said "Lush clearly had the opportunity and motive to exercise undue influence over Mary Draper." Even if this should be assumed we must not lose sight of the requirements of proof as to matters of this nature. The elements of undue influence are opportunity to control; a condition permitting subversion; and activity on the part of the person charged. It is *432 not sufficient to show that a party benefited by a will had the motive and the opportunity to exert such influence but there must be evidence that he did exert it and did so control the actions of the testator that the instrument is not really the will of the testator. In re Whitmarsh's Estate, 133 Misc. 858, 234 N.Y.S. 505, 509. Stress is laid upon Lush's conversation with Ward in which Lush said he would give Ward $5,000 over the $2,000 bequest in the will, and it is insinuated that Lush had arranged for the bequest with the idea that it would help to prevent a will contest. Contestants further insist that by the language in her will Mrs. Draper believed or was led to believe her estate would be small, that it would have been a simple matter for Lush to convince her that the estate would be very small; that she had told relatives she was leaving them items that by the will went to Lush; that she believed by making statements to her executor as to changes in her will he would see that her wishes were followed; that it is reasonable to believe Mrs. Draper gave Lush specific instructions as to disposition of any money left in her estate after various expenses were paid; that "This is the only possible way to correlate the facts in this case." Although these instances or a combination of them might be a basis for suspicion they are insufficient to prove that the will was executed because of the undue influence or fraud of Lush. The general tenor of the testimony showed that testatrix was a person who had a mind of her own, followed her own dictates even though she was wont to ask advice from different persons on occasion, and over a period of years had a continuity of purpose concerning various bequests made in the will.
Viewing the evidence and all inferences reasonably deducible therefrom in the light most favorable to contestants, there is insufficient foundation upon which the jury could have based a verdict that testatrix was acting under fraud and undue influence in making the will. The trial court was therefore correct in granting the motion, and the judgment is affirmed.
Affirmed.